UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TUFAMERICA, INC.,

                     Plaintiff,

          - against -

CODIGO MUSIC LLC, CODIGO PUBLISHING LLC,
CODIGO ENTERTAINMENT, LLC, THE CLYDE
OTIS MUSIC GROUP, and MORTON CRAFT,

                     Defendants.

**OPINION AND ORDER**

11 Civ. 1434 (ER)

---

Ramos, D.J.:

        This is a copyright and trademark case arising from the creation of a group of musical

compositions, sound recordings, and a trademark in the late 1960s.  The dispute has come to a

head only recently because, in 2006, the pop artist Christina Aguilera obtained a license from

some of the defendants in this case to sample one of the songs at issue.  Plaintiff TufAmerica,

Inc. is a company that acquires music rights and licenses those rights to third-parties for

exploitation.  Pl.'s Statement of Undisputed Facts in Support of Its Cross-Motion for Summary

Judgment (Doc. 132) ("Pl.'s 56.1") ¶ 29.  Plaintiff accuses Defendants Codigo Music LLC,

Codigo Publishing LLC, and Codigo Entertainment, LLC (collectively "Codigo"), and

Defendant The Clyde Otis Music Group ("COMG") (together with Codigo, the "Defendants"),[1]

of unauthorized copying, misappropriation, and trademark infringement.  Plaintiff asserts

ownership in the intellectual property at issue by virtue of a contractual agreement with

Defendant Morton Craft ("Craft"), a music producer, but when Craft denied entering this

---

[1] While Morton Craft is also a named defendant, the Court will refer to him separate and apart from Defendants
Codigo and COMG for ease of reference, mainly because Codigo and COMG have moved for summary judgment
and submitted all of their briefing together, while Craft has only opposed, in separate briefing, Plaintiff's summary
judgment motion.

agreement in the course of this litigation, Plaintiff added Craft as a defendant and asserted claims against him for equitable relief.

Before the Court are Plaintiff's and Defendants' cross-motions for summary judgment (Docs. 121, 131).  For the following reasons, both motions are GRANTED in part and DENIED in part.

## I. BACKGROUND

### A.  The Intellectual Property at Issue

This case concerns an original musical composition, another composition and four sound recordings that are all based on the original composition, and a trademark associated with a record label.  Below is a description of each work, organized chronologically in order of creation.

**Happy Man Composition and Sound Recording:**  Sometime in 1966 or 1967, a songwriter named Bobby Marin composed the music and lyrics to a song entitled "I'll Be a Happy Man" (the "Happy Man Composition").[2]  The song was written at the request of music producer and Defendant Morton Craft, although the nature of the relationship between Marin and Craft with regard to the Happy Man Composition, contractual or otherwise, is in dispute here. *See* Pl.'s 56.1 ¶¶ 3–6; Memorandum of Law in Opposition to TufAmerica's Motion for Partial Summary Judgment (Doc. 147) ("Defs.' Opp'n") at 2–3.  Soon thereafter, Craft had a band named The Latin Blues Band record a performance of the Happy Man Composition with instrumentals and vocals (the "Happy Man Sound Recording"), and that sound recording was included on an album titled "Take a Trip Pussycat," released on the Speed record label in or around 1968.  Pl.'s 56.1 ¶ 8; Defs.' Opp'n at 2–3.  While the parties agree that Craft was

---

[2] It is undisputed that the Happy Man Composition was never published.

involved with the Speed label, the parties dispute whether Craft was the label's sole owner, a co-owner, or if he played some other role. *See* Codigo and COMG's Counter Rule 56.1 Statement (Doc. 148) ("Defs.' 56.1 Counter") ¶¶ 1–2. In addition to musical compositions and sound recordings, the trademark for the Speed record label is also a contested piece of intellectual property at issue here.

**Happy Soul Sound Recording:** In 1967 or 1968, Craft and Marin together edited out the vocal tracks and shortened the length of the Happy Man Sound Recording. The new recording was titled "Happy Soul" (the "Happy Soul Sound Recording"), and it was released in 1968 on another Speed album entitled "Land of Love," which credited the song to the band The Moon People, even though the underlying tracks were the very same tracks originally recorded by The Latin Blues Band. *See* Pl.'s 56.1 ¶ 10; Defs.' Opp'n at 3–4.

**Happy Soul with a Hook Sound Recording:** In 1968, a musician by the name of Dave Cortez (a/k/a Dave Clowny) recorded an instrumental organ track, which was added to the Happy Soul Sound Recording. This new recording was titled "Happy Soul with a Hook" (the "Happy Soul with a Hook Sound Recording"), and was also released on the Speed label as a single in or around 1969. *See* Pl.'s 56.1 ¶¶ 13–15; Defs.' Opp'n at 4.

**Hippy Skippy Composition and Sound Recording:** In 1969, a musician named Harold Beatty composed a new version of the Happy Man Composition and titled it "Hippy Skippy Moon Strut (Opus #1)" (the "Hippy Skippy Composition"). Beatty sold the rights to the Hippy Skippy Composition "and all copyrights thereof" to Slew Enterprises, Ltd. ("Slew"), pursuant to a Standard Songwriters Contract between Beatty and Slew. *See* Pl.'s 56.1 ¶ 17; Defs.' Opp'n at 4; Declaration of Isidro Otis (Doc. 125) ("Otis Decl."), Ex. R (Beatty-Slew contract). Slew was

a Latin music record label owned and operated by Stanley Lewis, a business associate of Morton Craft.  *See* Pl.'s 56.1 ¶ 16; Defs.' Opp'n at 4 n.5.

On October 15, 1969, Stanley Lewis executed a written transfer agreement whereby, in exchange for $1.00, he purported to "sell," "assign," and "transfer all rights" to the Hippy Skippy Composition (and two other compositions) to Eden Music Co. ("Eden"), a music company owned by Clyde Otis, who was the founder of Defendant COMG.  Otis Decl., ¶¶ 4–6, Ex. S; Defs.' Opp'n at 4–5; Plaintiff's Response to Defendants' Statement of Undisputed Facts (Doc. 136) ¶ 30.  Eden registered the copyright for the Hippy Skippy Composition on November 14, 1969, listing Slew as a co-claimant, and obtained Copyright Registration No. EU159713.  Otis Decl. ¶ 7, Ex. T.[3]

Also in 1969, Slew recorded a performance of the Hippy Skippy Composition (the "Hippy Skippy Sound Recording") and released it as a single, the label of which credited "H. Beatty" as the songwriter and The Moon People as the performing artist, and listed both "Eden Music Corp./BMI" and "Slew Music/BMI."  *See* Pl.'s 56.1 ¶ 17; Defs.' Opp'n at 5; Declaration of Scott Zarin (Doc. 137) ("Zarin Decl."), Ex. H (scan of Slew release).  Around that same time, a record label named Roulette Records, Inc. ("Roulette") also released a single of the Hippy Skippy Sound Recording, which credited the writing to Beatty and the performance to the Moon People, and also listed both Eden and Slew on the face of the record itself.  *See* Zarin Decl., Ex. I (scan of Roulette release).  Under Defendants' version of the facts, further articulated below,[4] in

---

[3] Eden, along with Iza Music Corp. ("Iza"), another company affiliated with Clyde Morris and COMG, renewed this copyright on July 6, 2000, obtaining renewal number RE828-453.  Otis Decl. ¶ 8, Ex. U.  Additionally, on July 11, 2000, Iza and Argon Productions, yet another affiliate of COMG, applied for a copyright registration in the Hippy Skippy Sound Recording with the U.S. Copyright Office.  Declaration of Scott Zarin (Doc. 137), Ex. O; Defs.' 56.1 Counter ¶ 28.  It is undisputed that Eden never transferred any rights in the Hippy Skippy Composition or Sound Recording to Plaintiff.

[4] *See infra* Sec. I.C.2.

1969 Roulette "acquired Speed and Slew's entire Latin music catalog," which included all of the sound recordings identified above, and which (if true) would likely explain the Roulette release of the Hippy Skippy Sound Recording.  Defs.' Opp'n at 5.

Critically, it is undisputed that the Hippy Skippy Composition and all for Sound Recordings at issue here are *derivative* works,[5] with the pre-existing, underlying work being the Happy Man Composition.  *See, e.g.*, Defs.' 56.1 Counter ¶¶ 21–22; Defs.' Opp'n at 5.

### B.  Previous Litigation Over the Hippy Skippy Sample

In May 2006, COMG entered into a licensing agreement with RCA Music Group, a division of Sony BMG Music Entertainment ("Sony"), which allowed Sony to use a sample of the Hippy Skippy Sound Recording (the "Hippy Skippy Sample") in a song by the pop artist Christina Aguilera, titled "Ain't No Other Man."  Zarin Decl., Exs. W, X; Pl.'s 56.1 ¶¶ 44, 47; Defs.' Opp'n at 7.  Aguilera released "Ain't No Other Man" with the Hippy Skippy Sample in August 2006 to substantial commercial success.  Pl.'s 56.1 ¶¶ 48–49; Defs.' Opp'n at 7.

On August 11, 2006, around the same time "Ain't No Other Man" was released, Emusica Records, LLC ("Emusica"), a music company that was subsequently acquired by Codigo, wrote to Sony claiming that Emusica, not COMG, was the rightful owner of the Hippy Skippy Sound Recording.[6]  Emusica requested that Sony hold back the royalty payments generated by "Ain't No Other Man," and nominally owed to COMG under the aforementioned licensing agreement, until Emusica and COMG resolved their ownership dispute.  *See* Zarin Decl., Ex. Z; Pl.'s 56.1 ¶

---

[5] "A 'derivative work' is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted.  A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'"  17 U.S.C. § 101.  Generally, "[a] sound recording is a derivative work in relation to the musical work recorded therein, just as a motion picture is a derivative work in relation to the novel or screenplay upon which it is based."  1 Nimmer on Copyright § 2.10[A] n.8 (2015) (citations omitted).

[6] The basis for Emusica's claim of ownership in 2006 is further explained *infra* Sec. I.C.2.

51.  In July 2007, COMG filed a copyright-infringement action in the United States District Court for the District of New Jersey (the "DNJ Action") against Emusica and other parties who claimed ownership in the sound recordings used in "Ain't No Other Man," and Emusica filed counterclaims seeking a declaration that Emusica owned the Happy Man, Happy Soul, and Hippy Skippy Compositions and Sound Recordings.  *See* Pl.'s ¶¶ 53–54; Defs.' Opp'n at 7–8; Zarin Decl., Exs. AA, BB (COMG complaint and Emusica counterclaims).[7]

On February 28, 2009, the DNJ Action was resolved pursuant to a settlement agreement among Emusica, COMG, and other parties to the action (the "DNJ Settlement").  Declaration of Garrett S. Livingston (Doc. 144) ("Livingston Decl."), Ex. BB (DNJ Settlement); *see also* Pl.'s 56.1 ¶ 55; Defs.' Opp'n at 8.  The core terms of the DNJ Settlement were:  (i) a complete assignment to Emusica of all ownership rights in the Happy Man, Happy Soul, Happy Soul with a Hook, and Hippy Skippy Sound Recordings; (ii) an agreement to share revenues generated from the Happy Man, Happy Soul, Happy Soul with a Hook, and Hippy Skippy Compositions; and (iii) an agreement to share royalties generated from the 2006 licensing agreement between Sony and COMG.  *See* Defs.' Opp'n at 8 (summarizing terms); Livingston Decl., Ex. BB at 2–8; Pl.'s 56.1 ¶¶ 55–57.

### C.  The Present Action

#### 1.  Plaintiff TufAmerica's Chain of Title

Plaintiff's suit is based on the contention that it is the rightful owner of the musical compositions, sound recordings, and trademark at issue.  Plaintiff's alleged chain of title rests on two propositions:  (i) Morton Craft was the owner of all the disputed copyrights from their

---

[7] Neither Plaintiff TufAmerica nor Defendant Morton Craft were defendants in the DNJ action, and neither party had any direct involvement in that litigation.

inception up through 2004, and (ii) Craft and Plaintiff executed two agreements in 2004 that granted Plaintiff an exclusive license in perpetuity to all of the works at issue.

First, relying almost exclusively on Morton Craft's deposition testimony taken in this litigation, Plaintiff claims that Craft was the owner of the Speed record label, that "Craft owned all of the music he distributed on his 'Speed' record label unless he made an agreement with the writer of the music or a third-party to the contrary," and that Craft "entered an agreement" with Bobby Marin "pursuant to which Marin agreed to write and record songs for Craft." Pl.'s 56.1 ¶¶ 1–4. Thus, according to Plaintiff, Marin wrote and recorded the Happy Man Composition pursuant to a contractual agreement with Craft, and consequently Craft personally owned the copyright in both the Happy Man Composition and the Happy Man Sound Recording from the date of the creation of those two works. Id. ¶¶ 4–6. Plaintiff adds that Craft and Stanley Lewis had a "business relationship" and released music together, including the "Take a Trip Pussycat" album on Craft's Speed label, which contained some non-Latin-music tracks owned by Craft (including the Happy Man Sound Recording) and other Latin-music tracks owned by Lewis. Id. ¶¶ 7–9. Furthermore, in addition to never having transferred rights to the original Happy Man Composition, Plaintiff maintains that Craft was the impetus for the various derivations of the Happy Man Sound Recording that resulted in the creation and release of the Happy Soul and Happy Soul with a Hook Sound Recordings, and thus personally owned the copyright to those recordings upon their creation. Id. ¶¶ 10–15; see also Plaintiff's Omnibus Memorandum of Law (Doc. 133) ("Pl.'s Br.") at 32–35. As for the Hippy Skippy Composition and Sound Recording, Plaintiff attests that Craft (i) was the rightful owner of those derivative works by virtue of his ownership of the Happy Man Composition, (ii) did not authorize the creation of these works or the contract between Beatty and Lewis assigning ownership to Slew, (iii) was not aware of and

did not authorize the record releases by Slew or Roulette, and (iv) did not authorize Lewis or

Slew to transfer ownership of the works to Eden.  Pl.'s 56.1 ¶¶ 16–20; *see also* Pl.'s Br. at 24–

29, 33.

*Second*, Plaintiff points to documentary evidence and deposition testimony to establish

the existence and validity of two contractual agreements from 2004 (the "2004 Agreements") in

which Craft granted to Plaintiff all rights in the copyrights for the musical compositions, sound

recordings, and trademark at issue here.  Specifically, in the first agreement dated October 27,

2004 (the "October 2004 Agreement"), Plaintiff claims that Craft granted to it all copyrights and

exclusive, perpetual administrative and licensing rights to specific musical compositions and

sound recordings listed in three schedules attached to the October 2004 Agreement, as well as

rights to "compositions, sound recordings or any other property owned by Speed Records," "all

rights Craft has as artist, writer, producer, publisher or label owned," and "all rights in the master

tapes and all physical property relating to these copyrights."  Zarin Decl., Ex. P ("October 2004

Agreement") at § 1; Pl.'s 56.1 ¶ 32.  Schedule A of the October 2004 Agreement, a list of

musical compositions, includes a composition titled "Happy Soul (with a hook)" [sic],[8] Schedule

B, a list of individual sound recordings, includes the Happy Soul with a Hook Sound Recording,

and Schedule C, a list of albums, includes the "Take a Trip Pussycat" album by the Latin Blues

Band, on which the Happy Man Sound Recording was originally released.  October 2004

Agreement at Schedules A, B, C; Pl.'s 56.1 ¶¶ 33–35.  The October 2004 Agreement required

Craft to warrant that he was the "sole owner of the copyrights being administered by this

agreement," that previously he had validly obtained all the copyrights via "valid signed

---

[8] Neither party discusses in detail a separate composition for "Happy Soul with a Hook," and indeed the only
original element of such a work would be Dave Cortez's organ track, which was merely laid atop the original Happy
Man Sound Recording in the studio.  Nothing decisive turns on this discrepancy, however, and so the Court simply
notes it, and will continue to discuss only the Happy Soul with a Hook Sound Recording.

agreements with each and ever[y] artist, producer, songwriter and any other copyright holder associated with these copyrights" that "transfer all right, interest and title to Craft," that Craft "has not granted and…will not grant to any other person or entity the rights granted herein." October 2004 Agreement at § 3.[9]  Both parties warranted that the October 2004 Agreement was "being freely and voluntarily given by each without duress or coercion, after each party has had an opportunity to consult with legal counsel of its choice," and Craft additionally warranted that he was "an experienced veteran of the music industry and warrants that he understands all of the terms and conditions of this contract."  *Id.* at § 11.

In exchange for the copyrights it received, Plaintiff paid Craft a two-thousand five-hundred dollar ($2500) advance and a fifty percent (50%) royalty in all proceeds that Plaintiff generated from the exploitation of the copyrights granted by Craft.  October 2004 Agreement at § 1; Pl.'s 56.1 ¶ 32.  Additionally, Plaintiff promised to pay Craft an additional one-thousand dollars ($1000) per album upon Craft's producing the physical master tapes that together constituted "each of the albums on Speed Records," up to a total advance of ten-thousand five-hundred dollars ($10,500).  *See* October 2004 Agreement at § 1.i; Pl.'s 56.1 ¶ 37.  The October 2004 Agreement appears to be signed by both Craft and Aaron Fuchs, the President of TufAmerica, and both men appeared to initial each page, including the three schedules.  *Id.* According to the 2004 Agreement's preamble and Craft's signature line, Craft executed the agreement on behalf of "himself, Speed Records, Peek A Book and Slew Music."  October 2004 Agreement at pp. 1, 3.

---

[9] The October 2004 Agreement also required Craft to warrant that he "fully owned" the compositions and sound recordings in Schedules A and B, but did not require him to so warrant for the compositions and sound recordings in Schedule C.  October 2004 Agreement at § 3.

In a separate letter dated the same day, October 27, 2004 (the "2004 Amendment"), Plaintiff's counsel wrote to Craft to clarify that, upon execution of the letter, the October 2004 Agreement would be construed as (1) "an exclusive license in perpetuity in and to all rights in and to the copyrights in the musical compositions and sound recordings referenced on Schedules 'A,' 'B,' 'C,' and 'D' [sic], under common law and the Copyright Act of 1976…, including without limitation the right to sue and recover on accrued and future causes of action related thereto," and (2) "an exclusive worldwide license in perpetuity to the trademarks and trade names Speed Records, Peek A Boo, and Slew Music...."  Zarin Decl., Ex. Q ("2004 Amendment"); Pl.'s 56.1 ¶ 36.  The 2004 Amendment also appears to be signed by both Fuchs on behalf of Plaintiff and Craft on behalf of "himself, Speed Records, Peek A Boo and Slew Music."  2004 Amendment; Declaration of Steven M. Kaplan (Doc. 124), Ex. H ("Fuchs Tr.") at 150:18–20 (Fuchs' deposition testimony that signature on 2004 Amendment is his).

"Around the time" the 2004 Agreements were executed, Plaintiff asserts that it paid Craft the $2500 advance owed to him under the October 2004 Agreement, and then paid Craft an additional $2500 shortly thereafter.  Pl.'s 56.1 ¶ 38; Zarin Decl., Ex. R (Plaintiff's "Vendor QuickReport" for calendar-year 2004, listing one $2500 check on 10/25/2004 and another $2500 check on 11/1/2004, both made to "Monty Craft" [sic]); Zarin Decl., Ex. S (scan of check from Plaintiff that appears to be dated "10/24/04," made out to "Mort Craft" in the amount of $2500, signed by Fuchs, for "agreement: Speed Records: Oct. 27").

Plaintiff attests that, in November 2004, it "filed an application with the U.S. Copyright Office seeking a registration for each and every musical composition and sound recording" transferred under the 2004 Agreements, but has not submitted into the record any evidence of successful copyright registration.  Pl.'s 56.1 ¶ 39.  Plaintiff also submitted a copy of the October

2004 Agreement to the Copyright Office in November 2004, and received a Certificate of Recordation (the "2004 Certificate of Recordation") indicating that the Copyright Office had received the document in January 2005.  *Id.*; Zarin Decl., Ex. T (2004 Certificate of Recordation).  In February 2008, the Copyright Office issued a further Certificate of Recordation ("2008 Certificate of Recordation") indicating that it had receive an affidavit that Fuchs submitted attaching two additional lists of musical compositions and sound recordings (the "2008 Fuchs Affidavit"), all of which purported to "expand upon and amplify" the specific works that were transferred by the October 2004 Agreement, in particular the collection of individual songs included on the albums listed in Schedule C of the October 2004 Agreement, "whose individual titles were not known at the time of recordation of the [October 2004 Agreement]."  Zarin Decl., Ex. U (2008 Certificate of Recordation and 2008 Fuchs Affidavit); Pl.'s 56.1 ¶ 40.

Some unspecified time after executing the 2004 Agreements, Plaintiff released an album titled "Big Ol' Bag O' Boogaloo (Volumes 1, 2 & 3)," which contained some of the sound recordings at issue here.  Pl.'s 56.1 ¶ 42.  Plaintiff submits what it purports to be a royalty statement from 2010 reflecting royalties generated from the release of Plaintiff's album and owed to Craft under the 2004 Agreements, but since those royalties were not sufficient to recoup the $5000 advance already paid to Craft, Plaintiff "did not [] pay Craft any money with this statement."  *Id.* ¶ 43; Zarin Decl., Ex. V (copy of royalty statement).

### 2. Defendants Codigo and COMG's Chain of Title

Defendants naturally take a different view than Plaintiff of the initial ownership of the copyright to the Happy Man Composition.  Relying almost exclusively on Bobby Marin's declaration submitted in support of their motion for summary judgment, Declaration of Bobby

11

Marin (Doc. 145) ("Marin Decl."), Defendants claim that Craft approached Marin with a request to compose a collection of Latin songs that Craft would consider releasing on the Speed label, co-owned by Craft and Lewis at the time. *See* Defs.' 56.1 Counter at 22, ¶ 1. After Marin composed the music and lyrics to the Happy Man Composition, and after Speed put out the Latin Blues Band's recording of the Happy Man Sound Recording on the "Take a Trip Pussycat" album, Marin told Craft that Marin owned the rights to the Happy Man Composition, and that Craft would have to compensate Marin for use of the Happy Man Sound Recording. *Id.* at 22, ¶¶ 3–4; *see also* Livingston Decl., Ex. Z (BMI registration for Happy Man Composition listing "Bobby Marin Music Publishing" as publisher).[10] According to Defendants, Craft "agreed Marin owned the rights to the Happy Man Composition, and told Marin he would soon send him a written agreement either for the purchase of the Happy Man Composition, or the license to use it." Defs.' 56.1 Counter at 22, ¶ 5. Despite these promises, and despite Marin's "repeatedly request[ing] Craft to compensate him and send him an agreement," Defendants attest that Marin was never paid any compensation by Craft, Lewis, or anyone else at Speed, and that "[t]o this day, Marin has never agreed, either orally or in writing, to transfer any of his ownership rights in the Happy Man Composition" to anyone, "and thus Marin still owns the Happy Man Composition." *Id.* at 22–23, ¶ 6. Apart from the "repeated" requests to Craft for payment, neither Defendants nor Marin asserts that Marin, at any other time prior to the 2007 agreement described below, made any demand to anyone for payment for the sale of rights to the Happy Man Composition or for licensing fees.

---

[10] "BMI" stands for Broadcast Music, Inc., one of the major performing rights organizations in the United States. BMI collects licensing fees on behalf of composers and artists and distributes those fees back out to the composers and artists as royalties. *See* BMI, http://www.bmi.com (last visited January 12, 2016).

Following release of the Happy Man Sound Recording in 1968, Defendants assert that Marin worked with Craft to remove the vocal track from and shorten the length in order to create the Happy Soul Sound Recording, but that he did not have any involvement in the creation of the Happy Soul with a Hook Sound Recording or the Hippy Skippy Composition or Sound Recording.  *Id.* at 23–24, ¶¶ 7–12.  Marin's lack of authorization notwithstanding, Defendants state that Beatty composed the Hippy Skippy Composition and transferred it to Slew via written agreement signed by Beatty and Lewis, that Slew then sold the Hippy Skippy Composition to Eden, and that Eden subsequently registered for and obtained a copyright in the work on November 14, 1969.  *Id.* at 23–24, ¶¶ 12–13; Otis Decl. Ex. T (1969 certificate of copyright registration, listing "Eden Music Corp. & Slew Music" as copyright claimants).  Eden is a subsidiary of Clyde Otis, the founder of Defendant COMG.  Defs.' 56.1 Counter at 24, ¶ 13.[11]

The parties' theories of the facts diverge even further in or around April 1969 when, according to Defendants, Roulette Records, Inc. ("Roulette") "acquired Speed and Slew's entire Latin music catalog, which included the Happy Man Sound Recording, and all of the other Sound Recordings identified above."  *Id.* at 24, ¶ 16.  Having failed to locate a physical written document to establish this acquisition (the "Roulette Acquisition"), Defendants instead rely on Marin's declaration that he "know[s] as a fact that Roulette indeed acquired Speed and Slew's entire Latin catalog," including the musical works at issue here, because at the time Marin worked for a record company that "shared offices with Roulette" and one day "Craft came into the office and…told [Marin] that he was there because he and Lewis had sold Speed Records[']

---

[11] Eden subsequently renewed the copyright in the Hippy Skippy Composition on July 6, 2000.  Defs.' 56.1 Counter at 24, ¶ 14; Otis Decl., Ex. U (2000 certificate of registration).  Although not explicitly stated, Defendants' theory appears to be that Defendant COMG, via Clyde Otis and Eden, has validly owned the rights to the Hippy Skippy Composition since 1969.  As discussed further below, this view of the facts is at least in tension with Defendants' failure to assert that Marin—the owner of the composition from which the Hippy Skippy Composition was derivative—authorized Beatty's creation of the Hippy Skippy Composition.

entire Latin music catalog to Roulette and they were closing the transaction."  Marin Decl. ¶¶

12–13.  Marin claims that "[s]hortly afterwards" he "learned that the sale had indeed gone

through" and "recall[ed] also seeing mention of it in the industry trade papers."  *Id.* ¶ 13.

Defendants submit a copy of an article from the music publication *Billboard* dated April 26,

1969 (the "Billboard Article"), which reads in full:  "Roulette's Ethnic Tapes, Inc. has acquired

the Speed catalog.  Owned by Morty Kraft [sic], the label will be released under Ethnic's Latin

soul line."  *Id.*, Ex. CC (Billboard Article).[12]

Defendants next contend that, on July 29, 1975, Fania Records, Inc. ("Fania") entered

into a written agreement with Roulette (the "Roulette-Fania Agreement") to purchase "certain

assets" from Roulette, including the Happy Man, Happy Soul, Happy Soul with a Hook, and

Hippy Skippy Sound Recordings.  Defs.' 56.1 Counter at 25, ¶ 18; *see also* Declaration of Scott

Zarin (Doc. 156) ("Zarin Decl. II"), Ex. QQ (Roulette-Fania Agreement).

Fania later changed its name to Sonido around 1986 and, according to Defendants,

entered into a written agreement dated July 22, 2005 in which Emusica purchased Sonido's

assets (the "Sonido-Emusica Agreement"), including all four Sound Recordings and the rights to

use the Speed trademark.  Defs.' 56.1 Counter at 25, ¶¶ 18–19; *see also* Livingston Decl., Ex. W

(Sonido-Emusica Agreement), Ex. X (Oct. 13, 2005 letter from Sonido addressed to performing

rights organizations confirming execution and details of Sonido-Emusica Agreement).

Next, on November 16, 2007, Marin entered into an "Exclusive Administration

Agreement" with Emusica (the "Marin-Emusica Agreement"), in which he assigned to Emusica

all administration rights to the copyrights in a list of compositions that included the Happy Man

---

[12] Although the Marin Decl. states that Roulette acquired "Speed and Slew's entire Latin music catalog," Marin's specific recollection refers only to the Speed label, and likewise the Billboard Article refers only to the Speed label. On the other hand, Roulette's release of the Hippy Skippy Sound Recording does list Slew on the record's face, suggesting that that song *was* included in the Roulette Acquisition.  *See* Zarin Decl., Ex. I (scan of Roulette release).

Composition, in exchange for a $20,000 advance and an additional 80% royalty.  Defs.' 56.1 Counter at 25, ¶ 20; Livingston Decl., Ex. Y (Marin-Emusica Agreement).[13]  The Marin-Emusica Agreement was extended in December 2013 and remains operative.  Defs.' Opp'n at 6; Marin-Emusica Agreement at p. 8 (letter from Codigo to Marin exercising right to extend Marin-Emusica Agreement).

As described above, in February 2009, Emusica became party to the DNJ Settlement, in which Emusica purported to further clear its title to the Happy Man Composition and the Happy Man, Happy Soul, Happy Soul with a Hook, and Hippy Skippy Sound Recordings.  *See* Livingston Decl., Ex. BB (DNJ Settlement).

Finally, in April 23, 2009, SE Music Acquisition, LLC—which soon thereafter changed its name to Codigo Music, LLC—entered into a written agreement to purchase the assets of Emusica (the "Emusica-Codigo Agreement"), which by that point included the administrative rights to the Happy Man Composition, the rights to all four Sound Recordings, and the Speed trademark.  Defs.' 56.1 Counter at 25–26, ¶¶ 21–22; Livingston Decl., Ex. AA (Emusica-Codigo Agreement).  Thus, as a result of the above transactions and the DNJ Settlement, Defendants Codigo and COMG maintain that they are the rightful owners and/or administrators of the rights in all of the musical compositions, sound recordings, and trademark at issue in this litigation. Defs.' 56.1 Counter at 26, ¶ 23.

The parties' respective chains of title are summarized in the below flow chart:

---

[13] Schedule A of the Marin-Emusica agreement appears to be a list of compositions owned by Bobby Marin Publishing, and it indeed includes the Happy Man Composition.  Additionally, the schedule includes an unlabeled column corresponding to each composition that includes a certain percentage—and while the Happy Man Composition is listed as "100%," the schedule also includes the Happy Soul with a Hook Composition, credited to Dave Cortez and listed as "50%," and the Hippy Skippy Composition, credited to Harold Beatty and listed without any percentage.  Marin-Emusica Agreement at p. 7.  Neither party has attempted to explain the meaning of these listings, but that is perhaps beside the point, as Defendants are only relying on the Marin-Emusica Agreement for the proposition that Emusica obtained the copyrights to the Happy Man Composition.

| Plaintiff's Chain of Title | Defendant Codigo and COMG's Chain of Title |
|---|---|
| Happy Man Composition created by Marin and assigned to Craft (1966) | Happy Man Composition created and owned by Marin (1966) |
| Happy Man, Happy Soul, and Happy Soul with a Hook Sound Recordings created and owned by Craft and/or Speed (1967-68) | Happy Man, Happy Soul, and Happy Soul with a Hook Sound Recordings created and owned by Speed (1967-68) |
| Unauthorized creation of Hippy Skippy Composition and Sound Recording by Beatty and Slew (1969) | Hippy Skippy Composition and Sound Recording created by Beatty and transferred to Slew (1969) |
| 2004 Agreements: Craft transfers Happy Man Composition and Sound Recording, Happy Soul and Happy Soul with a Hook Sound Recording, and Speed mark to TufAmerica | Hippy Skippy Composition transferred from Slew to Eden, subsidiary of Clyde Otis, which registers copyright (1969) |
|  | Roulette Acquisition (1969): All four Sound Recordings and Speed mark transferred from Speed and Slew to Roulette |
|  | Roulette-Fania Agreement (1975): All four Sound Recordings and Speed mark transferred from Roulette to Fania. |
|  | Fania changes name to Sonido (1986) |
|  | Sonido-Emusica Agreement (2005): All four Sounding Recordings and Speed mark transferred from Sonido to Emusica |
|  | Marin-Emusica Agreement (2007): Happy Man Composition administrative rights assigned by Marin to Emusica |
|  | Emusica-Codigo Agreement (2009): Compositions, Sound Recordings, and Speed mark transferred from Emusica to Codigo |

### 3. The Parties' Claims for Relief

Plaintiff's Amended Complaint contains eleven causes of action against Codigo, COMG, and Craft. Amended Complaint (Doc. 36) ("Compl."). They are for:

1) Common law copyright infringement against Codigo (Compl. ¶¶ 38–43)

2) Common law trademark infringement against Codigo (Compl. ¶¶ 46–50)

3) Unfair competition against Codigo with respect to sound recordings (Compl. ¶¶ 51–57)

4) Unjust enrichment against Codigo and COMG (Compl. ¶¶ 58–60)

5) Misappropriation against Codigo and COMG (Compl. ¶¶ 61–62)

6) Declaratory judgment against Codigo declaring Plaintiff's rights in and to the musical compositions and sound recordings at issue (Compl. ¶¶ 63–67)

7) Declaratory judgment against Codigo declaring Plaintiff's rights in and to the Speed trademark (Compl. ¶¶ 68–72)

8) Declaratory judgment against COMG declaring as void COMG's copyright registration in the Hippy Skippy Composition, and declaring Plaintiff's rights in and to the Hippy Skippy Composition (Compl. ¶¶ 73–76)

9) Declaratory judgment against Craft declaring that the October 2004 Agreement is valid and enforceable (Compl. ¶¶ 78–81)

10) Declaratory judgment against Craft declaring that the 2004 Amendment is valid and enforceable (Compl. ¶¶ 82–85)

11) Injunctive relief against Craft seeking specific performance of the 2004 Agreements and an injunction preventing Craft from transferring any of the rights that were transferred to Plaintiff via the 2004 Agreements (Compl. ¶¶ 86–96)

Defendant Codigo asserts five counterclaims against Plaintiff. Codigo's Answer to Plaintiff's Amended Complaint, Affirmative Defenses, Counterclaim, and Cross-Claim (Doc. 46) ("Codigo Answer"). The counterclaims are for:

1) Declaratory judgment enforcing the terms of the DNJ Settlement and declaring that Codigo is the sole and exclusive owner of the musical compositions sound recordings, and trademark at issue in this case (except the Hippy Skippy Composition), and a permanent injunction restraining Plaintiff from exploiting any of that intellectual property in any manner (Codigo Answer at 17–19, ¶¶ 47–51)

2) Copyright infringement (Codigo Answer at 19, ¶¶ 52–59)

3) Unfair competition under § 43(a) the Lanham Act with respect to musical compositions, sound recordings, and trademark (Codigo Answer at 20, ¶¶ 60–65)

4) Unjust enrichment (Codigo Answer at 21, ¶¶ 66–68)

5) Misappropriation (Codigo Answer at 21,  ¶¶ 69–70)

Defendant COMG asserts four counterclaims against Plaintiff.  Counterclaims, Cross-Claim and Answer of Defendant COMG (Doc. 44) ("COMG Answer").  The counterclaims are for:

1) Declaratory judgment enforcing the terms of the DNJ Settlement and declaring that COMG is the sole and exclusive owner of the Hippy Skippy Composition, and a permanent injunction restraining Plaintiff from exploiting the Hippy Skippy Composition (COMG Answer at 19–20, ¶¶ 29–34)

2) Common law unfair competition with respect to musical compositions and sound recordings (COMG Answer at 20–21,  ¶¶ 35–40)

3) Unjust enrichment (COMG Answer at 21, ¶¶ 41–44)

4) Misappropriation (COMG Answer at 21, ¶¶ 45–47)

Finally, Defendant Craft asserts three counterclaims against Plaintiff.  Answer with Counterclaims (Doc. 43) ("Craft Answer").  The counterclaims are for:

1) Rescission of the October 2004 Agreement based on Plaintiff's undue influence over Craft (Craft Answer ¶¶ 103–08)

2) Breach of the October 2004 Agreement based on Plaintiff's failure to exploit the sound recording subject to the agreement and to compute and pay royalties owed to Craft (Craft Answer ¶¶ 109–13)

3) Breach of "certain licensing agreements" between Craft and Plaintiff that predated the 2004 Agreements, based on Plaintiff's failure to exploit the sound recordings that were the subject of the licensing agreements, and Plaintiff's failure to provide any accountings or to compute and pay royalties owed to Craft (Craft Answer ¶¶ 114–18).

### 4.  Cross-Motions for Summary Judgment

On April 29, 2015, Defendants Codigo and COMG jointly moved for partial summary judgment (Doc. 121) on all claims in the Amended Complaint asserted against them, as well as

18

an award of attorney's fees.  Memorandum of Law in Support of Joint Motion for Partial

Summary Judgment (Doc. 126) ("Defs.' Br.") at 1, 3.

On June 5, 2015, Plaintiff cross-moved for partial summary judgment (Doc. 131) on (i)

its sixth cause of action for a declaratory judgment against Codigo "as it relates to the musical

compositions at issue," (ii) its eighth cause of action seeking to declare as void COMG's

copyright registration in the Hippy Skippy Composition, (iii) its ninth, tenth, and eleventh cause

of action seeking declaratory judgments and an injunction against Craft with respect to the 2004

Agreements, (iv) all five of Codigo's counterclaims, (v) all four of COMG's counterclaims, and

(vi) all three of Craft's counterclaims.  Pl.'s Br. at 4.  Plaintiff also moves to strike all of

Codigo's, COMG's, and Craft's unsupported affirmative defenses.  *Id.* at 5.

Plaintiff opposes Codigo and COMG's joint motion in its entirety, and vice-versa.  *See*

*generally* Pl.'s Br; Defs.' Opp'n.  Craft also opposes Plaintiff motion in its entirety.  *See*

*generally* Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary

Judgment (Doc. 142) ("Craft Br.").

## II. DISCUSSION

### A. Summary Judgment Standard

To prevail on summary judgment, the movant must show that "there is no genuine

dispute as to any material fact."  FRCP 56(a).  "An issue of fact is 'genuine' if the evidence is

such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford*

*Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P.*

*v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A 'material' fact is one that might 'affect

the outcome of the litigation under the governing law.'"  *Id.*  "The function of the district court in

considering the motion for summary judgment is not to resolve disputed questions of fact but

only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).  On a summary judgment motion, the district court "may not make credibility determinations or weigh the evidence.... 'Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Id.* at 545–46 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'"  *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted).  The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment.  *Morales*, 249 F.3d at 121.

## B.  Musical Works:  Copyright Infringement,[14] Common Law Unfair Competition/Misappropriation,[15] Unjust Enrichment,[16] and Copyright-Related Declaratory Judgment Claims[17]

The parties correctly agree that, as a matter of law, proof of ownership of the musical works is an essential element of all of the copyright infringement, unfair competition by

---

[14] Plaintiff's first claim; Defendant Codigo's second counterclaim; Defendant COMG's second counterclaim.

[15] Plaintiff's third and fifth claims; Defendant Codigo's fifth counterclaim; Defendant COMG's second and forth counterclaims.

[16] Plaintiff's fourth claim; Defendant Codigo's fourth counterclaim; Defendant COMG's third counterclaim.

[17] Plaintiff's sixth and eighth claims; Defendant Codigo's first counterclaim; Defendant COMG's first counterclaim.

misappropriation,[18] unjust enrichment, and copyright-related declaratory judgment claims

brought here.  *See* Defs.' Br. at 8; Pl.'s Br at 31–35, 40–41.[19]  To prevail on their respective

cross-motions, then, each party has the burden of proving that no triable issues of fact exist with

respect to current ownership rights in the musical works at issue.  To the contrary, however,

there exist many such factual disputes, and thus the Court must deny the bulk of the parties'

summary judgment motions.

### 1.  Triable Issues Exist as to Pre-2004 Ownership of the Happy Man Composition

The parties do not dispute that all of the other musical works in this case are derivative of

the Happy Man Composition.  *See, e.g.*, Pl.'s 56.1 ¶¶ 21–22; Pl.'s Br. at 25 (citing Defs.' Br. at 1

n.1 ("The principal works at issue in this lawsuit…are all derivative works of Happy Man."));

Defs.' Opp'n at 5 ("[T]he Happy Soul Sound Recording, the Happy Soul with a Hook Sound

Recording, the Hippy Skippy Composition and the Hippy Skippy Sound Recording *were all*

*derived from and consist entirely* of the Happy Man Composition and edits to the Happy Man

---

[18] To the extent these claims are meant to apply to sound recordings, all parties plead their unfair-competition and misappropriation claims as though they were distinct.  But as Plaintiff correctly acknowledges (and Defendants nowhere dispute), the claims "are effectively the same…and must be treated as a single claim."  Pl.'s Br. at 40; *see also Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 437 (S.D.N.Y. 2011) ("Infringement of recordings made prior to 1972 may also give rise to a claim of unfair competition by misappropriation.") (citing *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)).  The Court will not construe unfair competition/misappropriation claims to apply to the two musical compositions at issue, however, because federal copyright law preempts them.  *Compare* 17 U.S.C. § 301(a) (preempting state law claims "equivalent" to exclusive rights under the federal copyright laws for, *inter alia*, unpublished works created prior to 1978), *with* § 301(c) (excluding sound recordings fixed prior to February 15, 1972 from preemption until 2067).

[19] "[T]he existence of a valid copyright" is the first essential element for a claim of copyright infringement, under both New York law and federal law.  *Lime Grp.*, 784 F. Supp. 2d at 436; *see also Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12 Civ. 6646 (AJN), 2015 WL 1402049, at *4 (S.D.N.Y. Mar. 25, 2015) (holding that elements of a common law copyright-infringement claim under New York law mirror those of a federal copyright-infringement claim).  Likewise, a claim of unfair competition by misappropriation requires proof that the aggrieved party's work has been commercially distributed without authorization.  *See Lime Grp.*, 784 F. Supp. 2d at 437 (requiring unauthorized distribution of "plaintiff's work" and noting the "significant legal overlap between a claim for unfair competition by misappropriation and a claim for infringement pursuant to federal copyright law") (citations omitted).  Finally, to prove unjust enrichment under New York law, a litigant must prove that the other party was enriched at the litigant's "expense," and there would be no "expense" but-for rightful ownership of the works at issue.  *See Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (listing elements of unjust-enrichment claim).

Sound Recording….") (emphasis added).  This fact is critical to the entire case, because it is axiomatic that the "consent of the copyright owner of a still-protected pre-existing work is necessary to render the derivative…work non-infringing."  1 Nimmer on Copyright § 3.06 (2015); *see also Stewart v. Abend*, 495 U.S. 207, 232 (1990) ("Congress simply intended that a derivative work author may not employ a copyrighted work without the [original] author's permission….").  Since the original copyright owner has the exclusive right to creative derivative works, someone "who reproduces a derivative work without the authorization of the preexisting work's registered owner 'violates…the exclusive rights of the copyright owner…[and] is an infringer of the copyright.'"  *Mattel, Inc. v. Robarb's, Inc.*, 139 F. Supp. 2d 487, 497 (S.D.N.Y. 2001) (quoting 17 U.S.C. § 501(a)), *on reconsideration in part*, No. 00 Civ. 4866 (RWS), 2001 WL 797478 (S.D.N.Y. July 12, 2001); *see also Cortner v. Israel*, 732 F.2d 267, 272 (2d Cir. 1984) (noting that a derivative composition does not infringe if created with consent of owner of underlying work).[20]

Thus, ownership of the original pre-existing work here—the Happy Man Composition— came with the exclusive right to authorize all of the subsequent derivative works at issue—the Happy Man, Happy Soul, and Happy Soul with a Hook Sound Recordings, and the Hippy Skippy Composition and Sound Recording.  Ownership of the Happy Man Composition is thus central to the resolution of the issues in the case.

With regards to that critical issue, Plaintiff argues that Craft was the rightful owner of the Happy Man Composition by virtue of an assignment from Marin,[21] while Defendants argue that

---

[20] When a derivative work *is* created with consent of the owner of the pre-existing work, "[t]he aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work."  *Stewart*, 495 U.S. at 223.

[21] Plaintiff also asserts that it has a "valid and enforceable copyright registration" for the Happy Man Composition. Pl.'s Br. at 29.  But Plaintiff nowhere produces evidence of this copyright registration, relying only on the 2004 and 2008 Certificates of Recordation.  *See* Pl.'s 56.1 ¶¶ 39–40.  These certificates merely confirm that the Copyright

Marin was the rightful owner because he never assigned the Happy Man Composition to Craft. Plaintiff has not been able to produce any written assignment agreement between Marin and Craft, but correctly points out that an "assignment of common law copyrights need not be in writing to be valid under New York law,"[22] and thus the Court "can infer that a transfer has taken place from subsequent conduct."  *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 538 (S.D.N.Y. 2015) (*citing Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 380 F.3d 624, 643–44 (2d Cir. 2004); *Jerry Vogel Music Co. v. Warner Bros.*, 535 F. Supp. 172, 175 (S.D.N.Y. 1982)).

Plaintiff points to some conduct on the part of Marin and Craft from which an inference of assignment may be made.  Specifically, when construed in light most favorable to Plaintiff, three undisputed facts could be combined to plausibly support an inference that Marin assigned the Happy Man Composition to Craft.  First, Marin claims that he demanded royalties from Craft but was never paid.  Second, despite this alleged non-payment, Marin continued to assist Craft in creating the Happy Man and Happy Soul Sound Recordings.  Third, Marin never took any legal action or any other steps to obtain royalties for use of the Happy Man Composition for roughly

---

Office received copies of the 2004 Agreements between Plaintiff and Craft and the 2008 Affidavit that Plaintiff submitted—they provide no evidence of valid copyright registration.  *See Latin Am. Music Co. Inc. v. Media Power Grp., Inc.*, 705 F.3d 34, 43 (1st Cir. 2013) ("[A] certificate of recordation is not evidence of registration because it merely indicates that the document attached was recorded in the Copyright Office on a specific date…. Because recordation of an instrument relating to a work does not indicate that the work itself has been registered, a certificate of recordation does not suffice to prove compliance with the registration requirement.") (citations and internal quotation marks omitted).

[22] The Court agrees with Plaintiff, Pl.'s Rep. at 1–2, that the question of whether the Happy Many Composition was assigned from Marin to Craft is governed by New York common law, because the composition was created while the 1909 Copyright Act was in effect and was never published.  *See Shoptalk, Ltd. v. Concorde-New Horizons Corp*., 168 F.3d 586, 590 (2d Cir. 1999) ("The 1909 Act…governs works published before 1978.  The 1909 Act established a regime in which published works could receive statutory protection under federal law, while unpublished works retained such protection as they were given by state common law.") (citations omitted); *Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004 (JAK), 2014 WL 7877773, at *9 (C.D. Cal. Oct. 30, 2014) ("Under the 1909 Act, the act of recording or distributing recordings does not constitute the publishing of a composition. Instead, in order to claim copyright in a musical work under the 1909 Act, the work had to be reduced to sheet music or other manuscript form."). (citation and internal quotation marks omitted).

forty years, until 2007, when he purported to transfer administrative rights under the Marin-Emusica Agreement.  *See* Marin Decl. ¶¶ 6–11, 14.  Marin's continued participation in the face of non-payment followed by a long period of inaction could theoretically allow a reasonable juror to find that Marin assigned the Happy Man Composition to Craft upon its creation.

That said, and contrary to Plaintiff's argument, Craft's deposition testimony provides scant support for such an inference.  *Cf.* Plaintiff's Omnibus Reply Memorandum of Law (Doc. 154) ("Pl.'s Rep.") 2 (arguing that Craft's testimony supports the finding of an assignment). Plaintiff repeatedly mischaracterizes Craft as explicitly testifying that Marin assigned the Happy Man Composition to him, but he said no such thing.  Rather, Craft testified *generally* that he would usually obtain an assignment from songwriters in exchange for royalties, while (i) explicitly stating multiple times that he has no specific recollection of whether Marin assigned the Happy Man Composition, and (ii) frequently confusing Marin with Henry Stone, the producer who owned the studio at which the Happy Man Sound Recording was recorded, and from whom Craft claims he obtained rights to the *sound recording* and not the *composition* of Happy Man.[23]  More critically, in practically every instance in which Craft stated his assumption

---

[23] *See* Declaration of Steven M. Kaplan (Doc. 122), Ex. F ("Craft Tr."), at 36 (Q: As far as you recall, did Mr. Marin ever sign a document transferring his rights as an owner in the musical composition to you?  A: I can't remember, but I'm sure he had to.  Q: Why?  A: Because that's the way we operated. Anybody I recorded and I paid for the session, I would get the rights to an original song from the artist, whoever wrote it, and I would register with BMI and later with ASCAP.); Craft Tr. at 37 (Q: Every song that you recorded from a new artist, you owned both the publishing and the musical composition?  A: Mostly, 99 percent.  Q: Okay.  A: I can't remember any other way, because every artist was stone broke.); *id.* at 38 (Q: Let me finish the question. You don't recall any specifics about what happened with the ownership rights to the song that Bobby Marin wrote that you're referring to?  A: Not too much, but Henry Stone might have owned it or controlled it verbally or legally, but I bought everything from Henry Stone, so whatever Henry Stone had ended up with me.); *id.* at 38–39 (claiming that Henry Stone "had the rights to everything from Bobby Marin"); *id.* at 39–40 (Q: Are you basing it on the fact that that's the way it worked or are you basing it on the fact that you know for sure, or certain, that that's what happened in that particular case?  A: Well, the only way I can know for sure, for certain, is if I had the papers on it.  Q: And otherwise you're just assuming, correct?  A: I assume, because everything I ever did was done that way, that I ended up owning everything, but I could have bought it from Henry Stone or got it for nothing from Henry Stone, I don't remember.); *id.* at 73 (Q: How do you know?  A: Because that's the way it worked in those days, no writer ever—he didn't have a nickel to their name.); *id.* at 76 (Q: Do you know whether it was ever transferred to you in any kind of writing?  A: Well, there must have been something, you don't just hand somebody thousands of dollars for a recording and not have something, but you're talking so long ago, I don't know where all my papers went to.); *id.* at 78–79 (answering

that he must have owned the Happy Man Composition, he explicitly premised that assumption on his insistence, apparently mistaken, that *he* registered the composition with BMI.[24]  The only BMI registration that exists for the Happy Man Composition, however, is under Marin's name, and it credits the publisher as "Bobby Marin Music Publishing."  *See* Livingston Decl., Ex. Z (Marin's BMI registration); Tr. at 35–47, 71–76 (Craft testimony basing his assumption on BMI).[25]  In other words, Craft's testimony that he assumes he acquired the Happy Man Composition because otherwise he could not have registered the song with BMI, coupled with the fact that Craft did not in fact register with BMI, supports only an inference that Craft *did not* obtain rights to this composition in this case.[26]

---

question about musical composition with contention that "Stone was the one that owned everything when that song was recorded, and I bought it during the recording or before the record, or whatever it was and paid for the session"); Declaration of Steven M. Kaplan (Doc. 123), Ex. G ("Craft Tr. II"), at 68 (Q: Are you aware of any written agreements between you and Bobby Marin?  A: No. Not that I can remember. I knew him well but I can't remember.).

[24] *See supra* note 10 (defining BMI); *infra* note 25 (Craft testimony regarding his mistaken belief that he obtained BMI registration).

[25] *See* Craft Tr. at 35:7–9 ("I owned the publishing, I got the publishing and took care of whatever was involved and registered with BMI."); *id.* at 36:8–11 ("Well, [Marin] gets a royalty from the sale, as every writer that writes, *even though they don't publish their own song* can get a royalty.") (emphasis added); *id.* at 36:20–24 ("Anybody I recorded and I paid for the session, I would get the rights to an original song from the artist, whoever wrote it, and I would register with BMI and later with ASCAP."); *id.* at 38 (Q: Are you assuming that that happened or you know it happened?  A: Well it would have had to happen in a way, because it's registered under me in BMI, but I might have had 20 different companies in BMI.); *id.* at 42–43 (Q: Do you have a specific recollection as you sit here today that the ownership right in the musical composition for the song that Bobby Marin wrote that you referred to was transferred to somebody other than Bobby Marin?  A: It was transferred to me. It was given to me. I own it because it's registered in BMI.); *id.* at 46–47 (Q: What I was asking you is were you basing your testimony that Bobby Marin assigned his rights in the publishing on the fact that you specifically recall him doing it or just because you're assuming it because that was your general practice?  A: I know he had to do it or I could never have registered in BMI.); *id.* at 72:2–6 ("Bobby Marin on this particular song, I can roughly say that I knew he was the writer and was—but I can't remember if he really was the only writer or the writer, but that would all be in BMI."); *id.* at 75:2–4 ("Nobody had anything to do with that song but Henry Stone and Morty Craft, and the real proof is what's in BMI."); *id.* at 75–76 (Q: But here's my question, are you testifying now that you have specific knowledge that Henry Stone transferred the publishing rights to the song that Bobby Marin wrote to you?  A: Yeah, because I got it in BMI.  Q: Do you have any–  A: I didn't even have to deal with it, I don't know how it–  Q: Do you have any–  A: It could have been turned over to me in many different ways, I can't remember the exact way, but I know I owned it or I could never put it in BMI.).

[26] Plaintiff attempts to circumvent the triable issues created by Craft's oft-contradictory testimony by arguing that Craft made a binding admission in his Answer that he owned the Happy Man Composition, but this is not availing.  *See* Pl.'s Br. at 21.  In response to Defendants' cross-claim allegation that Craft "has asserted that he has ownership

Meanwhile, Defendants' position plainly finds support in the record.  Most obviously, a reasonable juror could credit Marin's explicit declaration that he never assigned the rights to the Happy Man Composition to Craft or anybody else until the Marin-Emusica Agreement in 2007. Marin Decl. ¶ 7.  This declaration is corroborated by the BMI registration in Marin's name.  *See* Livingston Decl. ¶ 8, Ex. Z.   Furthermore, when the evidence is viewed in light most favorable to Defendants, Marin's consensual and continued involvement in creating the derivative sound recordings is not suggestive of an assignment of the Happy Man Composition, but instead could demonstrate merely that Marin authorized works derivative of a composition he continued to own.[27]  Indeed, Plaintiff's collection of case law demonstrating the indicia of assignment-by-conduct do more to undermine Plaintiff's position than support it, as the cases generally show far more substantial evidence of assignment than is present here.[28]

---

and other rights" in the works at issue here, Craft's Answer denies that allegation, except that it "admits that he has asserted rights" in the works.  *Compare* Codigo Answer at 21, ¶ 72, *and id.* COMG Answer at 22, ¶ 49, *with id.* Craft Answer ¶ 72.  This is arguably best read as a *denial* that Craft is asserting "ownership," as that word was explicitly omitted from the Answer, and the phrase "assert rights" could easily be referring to non-ownership interests, such as a right to license derivative sound recordings.  Regardless, Craft's pleading falls far short of the type of clear, unequivocal, and formal concession that is required of a binding judicial admission.  *See, e.g.*, *TR 39th St. Land Corp. v. Salsa Distrib. USA, LLC*, No. 11 Civ. 7193 (DF), 2015 WL 1499173, at *5 (S.D.N.Y. Mar. 25, 2015) (finding that statement was not a judicial admission because it was not "unequivocal" and because other statements were to the contrary); *Diaz v. Reno*, No. 97 Civ. 6580 (MBM), 2000 WL 502852, at *3 (S.D.N.Y. Apr. 26, 2000) (citing authorities defining "judicial admission" as "distinct and formal admission" or "unequivocal admission" made by attorney).

[27] The Court notes that Plaintiff's disputed claim that Craft paid royalties to Marin is not probative of an assignment of the Happy Man Composition.  *See Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.*, 16 F. Supp. 2d 259, 289 (S.D.N.Y. 1997) ("A payment of royalties is as consistent with a license as it is with an assignment, and thus does not in itself imply an assignment.") (citations omitted).

[28] *See* Pl.'s Rep. at 4–5 & n.4 (discussing cases).  In *Martha Graham*, for example, the evidence that the creator of certain dance works (Martha Graham) assigned the works to a center for dance "included letters, documents, contracts with third parties, minutes of the Center's board of directors meetings, financial records, and witness testimony showing that the Center consistently acted as the owner of these dances and that Graham did not object." Sharon Connelly, *Authorship, Ownership, and Control: Balancing the Economic and Artistic Issues Raised by the* Martha Graham *Copyright Case*, 15 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 837, 861–62 (2005) (discussing *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 224 F. Supp. 2d 567, 598–600 (S.D.N.Y. 2002), *aff'd in part, vacated in part*, 380 F.3d 624 (2d Cir. 2004)).  Likewise, in *Flo & Eddie*, not only was the only testimony that spoke directly to an assignment not contradicted, but there was "a huge amount of evidence" demonstrating that the assignee had licensed out the rights to sell records of the master recordings at issue and the rights to use the recordings in "movies, TV shows, and commercials," all of which

Based on the documentation surrounding initial ownership of the Happy Man Composition—or rather, the lack thereof—the Court also notes that a reasonable juror might find that Marin assigned his rights to Craft's record label, Speed, which released the Happy Man Sound Recording.  This was, in fact, Defendants' own initial theory in their summary judgment briefings prior to their submitting Marin's declaration, which solidified Defendants' position. *See* Defs.' Br. at 3–4.  Combined with the disputed facts surrounding the Roulette Acquisition, the Roulette-Fania Agreement, and the 2004 Agreements, all discussed below, a reasonable juror might conclude that Speed transferred ownership in 1969 or, instead, retained its rights to the Happy Man Composition up through 2004, at which point Craft transferred those rights to Plaintiff on behalf of Speed.

Finally, though it is of course not controlling, the Court notes that Craft's own position in his opposition brief is that genuine issues of material fact exist as to whether he owned the musical works at the time of the 2004 Agreements.  *See* Craft Br. at 18–20.

In sum, even though Plaintiff's position rests on a thin reed of evidence at best, "[t]he existence of a transfer or assignment of common law copyright…is a *factual* question of the author's intent" that must be resolved by a jury.  *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1328 (9th Cir. 2000) (emphasis added) (citations omitted).  "While a jury may conclude that on balance the evidence demonstrates that [Marin]

demonstrated "the kind of licensing activity that only an owner of the rights in the sound recordings could legally do." *Flo & Eddie*, 80 F. Supp. 3d at 538–39.  Here, by contrast, there is no evidence that Craft licensed Marin's work to *any* third-party until 2004.  In *Jerry Vogel*, the assignee had published the song at issue under his name and registered the copyright to the song in his name, conduct that bespoke of an "ongoing relationship" between the assignor and assignee, and which appears to be absent in the case of Marin and Craft.  *See Jerry Vogel*, 535 F. Supp. at 175.  Finally, in *Siegel*, the assignor's conduct clearly demonstrated acquiescence to an assignment because the assignor explicitly agreed in writing (i) to hand over to the assignee the original manuscript and artwork of the comic strips at issue, and more importantly, (ii) to allow the copyright notice to be made in the assignee's name, "something which under the 1909 Act could not be undertaken by a mere licensee but only 'the author or proprietor' of the work." *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1087 (C.D. Cal. 2009).  Again, no such facts are present here.

had no intent to transfer to [Craft] his common law copyrights, at the summary judgment stage, a district court is entitled neither to assess the weight of the conflicting evidence nor to make credibility determinations." *Id.* (citation omitted).  The Court thus holds that there is a genuine issue of material fact as to whether Marin held onto his initial ownership rights in the Happy Man Composition, or whether Marin assigned his ownership rights over to Craft or Speed Records.[29]

### 2. Triable Issues Exist as to Pre-2004 Ownership of the Happy Man, Happy Soul, and Happy Soul with a Hook Sound Recordings

"Sound recordings are 'derivative' works of the preexisting musical composition, and to obtain a copyright in a sound recording one must secure a license from the copyright owner of the underlying work." *In re Cellco P'ship*, 663 F. Supp. 2d 363, 369 n.6 (S.D.N.Y. 2009); *see also* Pl.'s Br. at 32.  Because the Sound Recordings at issue here were created prior to 1972, they are not protected by federal copyright law, but instead "are protected by state common law on

---

[29] For the first time in its reply brief, Pl.'s Rep. at 5–7, Plaintiff proposes the theory that Craft has *always* had ownership of the Happy Man Composition via the work-for-hire doctrine, which holds that, where an author creates a work "for hire," it is the employer and not the hired author who is deemed the rightful owner of the work. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 137 (2d Cir. 2013) ("The hired party, although the 'author' in the colloquial sense, therefore never owned the copyrights to assign.") (citation omitted).  Even if Plaintiff is found not to have waived this argument, the record reflects no triable issues as to whether the Happy Man Composition was a work for hire.  The applicable inquiry is whether the Happy Man Composition was made at Craft's "instance and expense," and the "general rule" is that "[a] work is made at the hiring party's 'instance and expense' when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out." *Id.* at 139 (citation and internal quotation marks omitted).  Here, although Craft initially requested that Marin write the song, there is no evidence that Craft exerted any creative control over the composition or financed the songwriting (as opposed to the recording session) in any manner whatsoever. *See* Craft Tr. at 48:6–9 ("I don't know, he could have written it any amount of time before it was recorded, you never know when an artist writes something."); *id.* at 72:13–14 ("I don't know when he wrote it or when he did it.").  Moreover, at his deposition, Craft repeatedly and consistently testified that he would obtain assignments from songwriters in exchange for royalties, and never once came close to suggesting that he took on an employer-type role with creative control that resulted in his owning musical compositions from inception. *See* Craft Tr. at 36–37, 43, 46–47, 78–79; Craft Tr. II at 10–11, 27–28.  In contrast, Plaintiff does not cite to any deposition testimony that supports a work-for-hire theory, because none exists.  Finally, Plaintiff's contention that Craft paid Marin royalties directly undercuts its position that the composition was made for hire. *See Kirby*, 726 F.3d at 140 ("[P]ayment of a sum certain suggests a work-for-hire arrangement; but where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship.") (citation and internal quotation marks omitted).

copyright infringement." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 436

(S.D.N.Y. 2011) (citing 17 U.S.C. § 301(c); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 830

N.E.2d 250, 263–64 (N.Y. 2005) (recognizing that New York common law protects pre–1972

sound recordings)).  A claim for infringement pursuant to New York common law consists of

two elements: (1) a valid copyright; and (2) unauthorized reproduction of the work protected by

the copyright.  *See id.*; *Naxos*, 830 N.E.2d at 266.[30]

       As discussed above, the identity of the owner of the Happy Man Composition, and thus

the person or entity empowered to authorize derivative sound recordings, remains a disputed

issue of fact.  All of the most likely candidates, however—Marin, Craft, or Speed Records—

were intimately involved in the creation of the Sound Recordings at issue here, and it is likely for

that reason that no party explicitly asks the Court to hold that the Happy Man, Happy Soul, and

Happy Soul with a Hook Sound Recordings were *unauthorized* derivative works.  In fact, the

parties are not that far off with their competing theories of ownership of these three Sound

Recordings:  Plaintiff proposes that Craft owned the works either personally or through Speed,

and then transferred them via the 2004 Agreements, while Defendants maintain that Speed

owned the works, and then transferred them via the Roulette Acquisition.  Here too, however, the

competing theories both rely on multiple disputed issues of fact, all of which remain irresolvable

by the Court at this juncture.

       Plaintiff argues that the same (unproduced) written agreement between Marin and Craft

that vested Craft with ownership of the Happy Man Composition *also* vested Craft with

ownership of the Happy Man Sound Recording.  Pl.'s Br. at 1.  Plaintiff thus stakes out the

position that, as the rightful owner of the Happy Man Composition and both the catalyst and

---

[30] The elements of common law copyright-infringement under New York law mirror the elements of federal copyright-infringement.  *See Escape Media*, 2015 WL 1402049, at *4.

financier for the Happy Man, Happy Soul, and Happy Soul with a Hook Sound Recordings, Craft

was the exclusive owner of those works up until the 2004 Agreements.  *See id.* at 31–35.

      Plaintiff's position again relies exclusively on Craft's deposition testimony.  Compared to

his vague responses regarding the Happy Man Composition, Craft's testimony with regard to

these three Sound Recordings is marginally more specific, but it ultimately remains a muddle

that is easily amenable to conflicting interpretations.  For example, regarding the Happy Man

Sound Recording, Craft repeatedly testified that he "put [the recording session] together," "paid

for the studio" and "paid of the session," would "tell everybody [at the recording session] what

they [could] do," and specifically recalled "acquir[ing]" all rights in the recording from the

producer who owned the studio, Henry Stone.  *See* Declaration of Steven M. Kaplan (Doc. 122),

Ex. F ("Craft Tr."), at 34–35, 48, 72–73, 78–79, 81.[31]  He also testified, however, to having no

specific recollection of the Happy Man Sound Recording or its release on the Speed label.  *See*

Declaration of Steven M. Kaplan (Doc. 123), Ex. G ("Craft Tr. II"), at 20–24.[32]  When presented

with a cover of the "Land of Love" album by the Moon People that contained the Happy Soul

Sound Recording, Craft stated that all the songs on the album belonged to him, but he also

disavowed involvement in the record's release, which he accredited to Stanley Lewis'

unauthorized activities.  *See* Craft Tr. at 112–15; Craft Tr. II at 32–35.  Similarly, when shown

the Happy Soul with a Hook single release, Craft noted that the song title sounded "familiar" and

claimed that he owned the song because it was credited to "Dave Cortez and the Moon People,"

but could not explain why his name was listed as a producer on the single, could not recall

adding the additional organ track to the recording, and repeatedly disavowed all involvement in

---

[31] Craft's first deposition took place on October 18, 2011.

[32] Craft's second deposition took place on December 4, 2013.

the release of the single, again accusing Lewis of putting out one of Craft's songs without authorization.  *See* Craft Tr. at 117–28, 143; Craft Tr. II at 36–38.

Plaintiff also tries to claim that Craft directly claimed ownership over these Sound Recordings because Craft's testimony (i) indicates that his business relationship with Stanley Lewis was such that Lewis would own all of the "Latin" songs released on the Speed label and Craft would own all other songs released on Speed, and (ii) indicates Craft's belief that the songs at issue here were "rock" songs, not "Latin" songs.  *See* Pl.'s Br. at 18–20 (citing Craft Tr. at 32– 33, 53–55, 59–60, 116); *see also* Craft Tr. II at 68–69.  This too is disputed by Defendants, who agree that Craft never owned Latin music, but point to Marin's statements that the Happy Man Sound Recording was "unquestionably Latin music," to Marin's status as "one of the musical artists at the forefront of the Latin Boogaloo movement," and to the fact that the Happy Man Sound Recording was "widely known as Latin music" and originally recorded by the *Latin* Blues Band.  *See* Memorandum of Law in Further Support of Joint Motion for Partial Summary Judgment (Doc. 149) ("Defs.' Rep.") 5–6 (citing Marin Decl. ¶¶ 2–5).

As for Defendants' theory, it appears to assume that the Speed record label obtained ownership of the three Sound Recordings upon their creation.  Defs.' Br. at 3–4; *see also* Defs.' Opp'n at 9, 12 (arguing that Craft's only possible claim to ownership in the Sound Recordings would be through his partnership in Speed).  Defendants do not articulate any specific explanation for this assumption, but presumably rely on the fact that the Happy Man, Happy Soul, and Happy Soul with a Hook Sound Recordings were all released on the Speed label. Defendants instead jump right to the conclusion that the Sound Recordings were transferred from Speed to Roulette in 1969 via the Roulette Acquisition.  *See id.*  While Defendants have been unable to produce any written agreement documenting this transaction, they rely on (i) Marin's

declaration, which claims personal knowledge of the Roulette Acquisition, and (ii) the Billboard Article from April 1969, which reports a transaction in which Ethnic Tapes, Inc., a division of Roulette, "acquired the Speed catalog."  *See* Defs.' 56.1 Counter at 24–25, ¶¶ 16–17; Billboard Article.

Plaintiff disputes that the Roulette Acquisition ever took place, and creates a genuine issue of material fact in doing so.  In addition to the lack of any written agreement, Craft explicitly testified that he "never sold…any of [his] product" to Roulette and never had any "contractual relations" with Roulette's owner, Morris Levy.  Craft Tr. II at 45, 69.  Craft also admitted, however, that he had "heard" Stanley Lewis had transferred Speed properties to Roulette without Craft's required authorization.  Craft Tr. at 89–91.  Plaintiff also piggybacks on Defendants' own assertion that the Roulette Acquisition involved only "Speed and Slew's entire Latin music catalog," Defs.' 56.1 Counter at 24, ¶ 16, again arguing that the Sound Recordings at issue were *not* Latin music, and thus were not included in the Roulette Acquisition as Defendants' themselves define it.  *See* Pl.'s Rep. at 9–10.[33]

Yet another factual dispute exists with respect to the Roulette-Fania Agreement from 1975.  Unlike the Roulette Acquisition, Defendants have produced an actual copy of the agreement and represent that the Happy Man, Happy Soul, Happy Soul with a Hook, and Hippy Skippy Sound Recordings were among those assets transferred.  *See* Defs.' 56.1 Counter at 25, ¶ 18 (citing Livingston Decl. ¶ 2); Roulette-Fania Agreement.  Rather than dispute the existence of

---

[33] Plaintiff also argues that both Marin's recollection and the Billboard Article are inadmissible hearsay upon which the Court may not rely at the summary judgment stage.  Pl.'s Rep. at 9–10 & n.9.  Neither argument is availing, however.  Marin's recollection is not hearsay, because it is explicitly premised on his own personal knowledge gleaned from multiple sources of information other than Craft's previous statements to him.  *See* Marin Decl. ¶ 13 ("I learned that the sale had indeed gone through and I recall also seeing mention of it in the industry trade papers").  Furthermore, the Billboard Article is over twenty-years old and is thus both admissible under the "ancient document" hearsay exception and self-authenticating.  *See* Fed. R. Evid. 803(16), 902(6).  Plaintiff is free to ask this Court to reconsider by moving *in limine* for exclusion of any inadmissible evidence prior to trial.

the agreement, Plaintiff instead plausibly contends that it did not actually effect the transfer of these particular Sound Recordings.  First, Plaintiff points out that the Roulette-Fania Agreement, by its own express terms, applies only to the following labels:  "Tico," "Alegre," "Mardi Gra," and "Speed Swinger."  *See* Pl.'s Rep. at 12 (citing Roulette-Fania Agreement at 1).  Since the Happy Man, Happy Soul, and Happy Soul with a Hook Sound Recordings were released only on the Speed record label, and Defendants failed to adduce any evidence that "Speed Swinger" (or the other three labels) was a synonym for "Speed," Plaintiff argues that the Roulette-Fania Agreement did not actually transfer those three Sound Recordings.  *Id*. at 12–13.  Plaintiff also points to Craft's testimony, in which he arguably claims ignorance of any record label named "Speed Swinger," and the testimony of Defendant Codigo's principal Garrett Livingston, in which he fails to explain the basis for his belief that the four labels listed in the Roulette-Fania Agreement encapsulated all of the musical works owned by Roulette that were "Latin" in origin. *See* Pl.'s Rep. at 13 (citing Craft Tr. II at 49; Zarin Decl. II, Ex. RR (Livingston Deposition), at 68–84).  Once again, without the ability to weigh this competing evidence, the Court cannot resolve this issue on summary judgment.

All told, the Court is unable to weigh all of this conflicting evidence at this stage.  There thus remains a significant number of genuine issues of material fact as to the pre-2004 ownership of the Happy Man, Happy Soul, and Happy Soul with a Hook Sound Recordings.

### 3. Triable Issues Exist as to Pre-2004 Ownership of Hippy Skippy Composition and Sound Recording

As works that were derivative of the original Happy Man Composition, the Hippy Skippy Composition and Sound Recording could not be validly copyrighted without authorization from the owner of the underlying work.  Under any theory of ownership proposed here, however, the Hippy Skippy works were plainly *not authorized* by Marin, Craft, the Speed record label, or any

33

other actor with a viable claim of ownership.  Instead, it is undisputed that Harold Beatty wrote

the composition and assigned it to the Slew label pursuant to a contract with Stanley Lewis—and

no party even attempts to contend that such copying was authorized.  *See* Defs.' Opp'n at 3–4

(noting both that Marin never transferred his ownership of the Happy Man Composition to

anyone and that Beatty authored the Hippy Skippy Composition); Pl.'s Br. at 28 n.10 (noting

Codigo's admission that Marin never authorized Beatty's composition); Pl.'s 56.1 ¶¶ 17–18

(noting that Craft was not aware of Beatty's composition).

There is thus no doubt that a cause of action exists to invalidate Eden's 1969 copyright

registration in the Hippy Skippy Composition, because it is undisputed that this was an

unauthorized derivative work.  The rub is that this cause of action belongs to the current owner

of the Happy Man Composition rights, which is of course the central and disputed factual issue

in this case.  *Compare* Defs.' Rep. at 6–8 (arguing that Plaintiff has no standing to invalidate the

copyright registration because it has no ownership rights in the Happy Man Composition), *with*

Pl.'s Rep. at 7–8 (arguing that the copyright registration should be invalidated because Plaintiff

acquired the Happy Man Composition rights from Craft, who never authorized the Hippy Skippy

Composition).  For this reason, therefore, all copyright-related claims pertaining to the Hippy

Skippy Composition and Sound Recording cannot be resolved on summary judgment.

Additionally, the Court notes some additional disputed factual issues.  First, while

Defendants maintain that Slew's rights in the Hippy Skippy Sound Recording were transferred in

the Roulette Acquisition, Defs.' Opp'n at 5 (stating Roulette "acquired Speed and Slew's entire

Latin music catalog, which included…all of the other Sound Recordings identified above"), the

Billboard Article reporting the acquisition does not mention Slew at all and was published in

April 1969, while Defendants assert that it was not until December 1969 that Slew recorded and

released the Hippy Skippy Sound Recording, *id.*  Second, the same factual issue that exists

regarding the Roulette-Fania Agreement, discussed above,[34] applies equally to the Hippy Skippy

Sound Recording, which was released only on the Slew and Roulette labels, neither of which

were expressly listed in the terms of the Roulette-Fania Agreement.  *See* Pl.'s Rep. at 12–13

(citing Roulette-Fania Agreement at 1).

### 4.   Triable Issues Exist as to the Enforceability of the 2004 Agreements

It is undisputed that every one of Plaintiff's affirmative claims turns on the validity and

enforceability of the 2004 Agreements between Plaintiff and Craft.  Defendants and Craft, in

opposing Plaintiff's summary judgment motion, together argue that there remain genuine issues

of material fact with respect to (i) whether Craft actually entered into the October 2004

Agreement, and (ii) whether Craft can prevail on three affirmative defenses:  fraud in the

execution, undue influence, and unclean hands.  *See* Defs.' Br at 6–13; Defs.' Rep. at 1–4; Craft

Br. at 5–17.  The Court finds that triable issues remain only with regard to the affirmative

defenses of fraud in the execution and unclean hands.

First, with respect to basic issues of contract formation, both Defendants and Craft go to

great lengths to attempt to convince the Court that Craft's deposition testimony is best construed

as denying that he ever entered the 2004 Agreements.  *See* Craft Br. at 5–6; Defs.' Rep. at 2–4.

That may be so, but critically, this *ex-post* testimony is the only evidence that these parties rely

on when arguing that Craft never executed the 2004 Agreements.  The parties do not dispute, for

example, that the contract's material terms are stated in "clear and unequivocal language," which

means the Court cannot conclude that the parties failed to manifest intent to be bound.  *See*

*McNamara v. Tourneau, Inc.*, 464 F. Supp. 2d 232, 238 (S.D.N.Y. 2006) ("To determine if the

---

[34] *See supra* II.B.2.

parties agreed on a contract's material terms, New York courts must first look to the written contract to assess whether it contains clear and unequivocal language or whether the language is ambiguous such that the parties could reasonably interpret it in different ways.") (citation omitted).  And while Craft surely testified that he never entered into or signed the 2004 Agreements, neither Defendants nor Craft explicitly argue that the signatures on the documents themselves were forged or argue that copies of the documents submitted to the Court are inauthentic, let alone provide evidence of either contention.  To the contrary, there is no evidentiary basis on which to conclude that the signatures on the 2004 Agreements do not belong to Craft,[35] and Defendants and Craft have no explanation for how Craft himself was able to produce the fully executed October 2004 Agreement from his own files during discovery in this case.  *See* Pl.'s Br. at 14.  Craft's self-serving deposition testimony standing alone is therefore not sufficient to create a triable issue of fact as to whether Craft executed the 2004 Agreements, where no party argues that the contracts did not contain both Craft's signature and clear, unambiguous terms.  *Cf. TD Bank, N.A. v. Piccolo Mondo 21st Century, Inc.*, 949 N.Y.S.2d 444, 446 (N.Y. App. Div. 2012) ("Something more than a bald assertion of forgery is required to create an issue of fact contesting the authenticity of a signature.").  Craft is "bound by a contract [he] has signed" absent "special circumstances," *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116

---

[35] The closest Craft ever got to questioning the validity of his signature is when he stated at one point during his deposition that the signature "doesn't look like mine…it doesn't look right.  I can't tell if the signature—they did a good copying job if they did it, but lots of people do that stuff."  Craft Tr. at 182–83.  When shown the signature on the 2004 Amendment, he also stated, "I don't think it's mine."  *Id.* at 188–89.  The Court notes, however, that no party in its briefing has leveraged these two snippets of testimony to explicitly argue that the signatures on the 2004 Agreements were forged, nor has any corroborative evidence of forgery (*e.g.*, an expert report or other Craft signatures) been submitted.  Craft also had ample opportunity to explicitly assert an accusation of forgery throughout both of his depositions, and never did so.  Furthermore, and unsurprisingly given the overall nature of his testimony, Craft also testified that the very same signature on the October 2004 Agreement "looks like my signature."  *Id.* at 174:5–7.  The Court concludes that the clear upshot of Craft's testimony is that he simply does not recall whether the signature is his or not.  *See, e.g.*, Craft Tr. at 174 ("I never signed this to Tuf, did I?...I can't remember."); *id.* at 175 (Q: Do you recall signing an agreement with TufAmerica in October of– A: No.); *id.* at 177–78 (denying all recollection of entering into the 2004 Agreement).

F.3d 28, 34 (2d Cir. 1997), "regardless of his…failure to read and understand its terms," *Ecoline, Inc. v. Local Union No. 12 of Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers, AFL-CIO*, 271 Fed. Appx. 70, 72 (2d Cir. 2008) (citation and internal quotation marks omitted). Under New York law, a party who signs a contract is "'conclusively presumed to know its contents and to assent to them.'" *State Bank v. Star Diamonds, Inc.*, 901 F. Supp. 177, 179 (S.D.N.Y. 1995) (quoting *Metzger v. Aetna Ins. Co.*, 125 N.E. 814, 816 (N.Y. 1920)); *see also Arakawa v. Japan Network Grp.*, 56 F. Supp. 2d 349, 352 (S.D.N.Y. 1999) (same).

That Craft signed the 2004 Agreements does not preclude them from being held as void based on proof of some fraudulent or wrongful conduct on Plaintiff's part, however. *See, e.g.*, *Da Silva v. Musso*, 428 N.E.2d 382, 386 (N.Y. 1981) ("Under long accepted principles one who signs a document is, *absent fraud or other wrongful act of the other contracting party*, bound by its contents.") (emphasis added). Together, Defendants and Craft argue that three affirmative defenses apply to deem the 2004 Agreements unenforceable:  (i) fraud in the execution, (ii) undue influence, and (iii) unclean hands. Craft Br. at 8; Defs.' Br. at 10–12.

### a. Fraud in the Execution

"Fraud in the execution occurs where there is a 'misrepresentation as to the character or essential terms of a proposed contract,' and a party signs without knowing or having a 'reasonable opportunity to know of its character or essential terms.'" *Hetchkop*, 116 F.3d at 31–32 (quoting Restatement (Second) of Contracts § 163 comment *a* (1981)). "Fraud in the execution prevents the parties from achieving mutual assent and, thus, prevents the parties from forming a valid contract." *Allen v. Chanel, Inc.*, No. 12 Civ. 6758 (LAP), 2015 WL 3938096, at *7 (S.D.N.Y. June 26, 2015); *see also Hetchkop*, 116 F.3d at 32 ("[F]raud in the execution, if established, renders a purported agreement void *ab initio*.") (citations omitted).  It is an

affirmative defense, for which the defense would bear the burden of proof at trial.  *See Trs. of Welfare Fund & Pension Fund of Local No. One, I.A.T.S.E. v. A. Terzi Prods., Inc.*, No. 97 Civ. 8262 (MGC), 1999 WL 33870, at *1 (S.D.N.Y. Jan. 25, 1999) (citing *Hetchkop*, 116 F.3d at 31, 33).  But it is "only a defense to enforcement where the signer was not negligent in failing to read the document he signed."  *Schaeffer v. Kessler*, No. 12 Civ. 8576 (PKC), 2013 WL 1155587, at *7 (S.D.N.Y. Mar. 20, 2013) (citations omitted).

Craft highlights four draft documents produced by Plaintiff in discovery, each entitled "Deal Memo," which predated the 2004 Agreements and purportedly were given to Craft in order to inform him of the core terms of the transaction (collectively, the "Deal Memos").  *See* Craft Br. at 8–9; Declaration of Peter T. Salzler (Doc. 141) ("Salzler Decl."), Ex. M (Deal Memos).  Each Deal Memo, the latest of which is dated October 25, 2004, states that Craft was to convey *only 50%* of his rights in seven specific albums, in exchange for a $2500 advance and a $1000 per-album payment upon physical production of each of the seven albums.  *Id.* Similarly, a document dated October 5, 2004 that appears to be a draft of the full agreement (the "Draft Agreement") also obligates Craft to convey *only 50%* of his rights, but this document purports to cover *all* musical compositions and sound recordings that Craft owned, all in exchange for a $2000 advance.  Salzler Decl., Ex. N (Draft Agreement).  The final October 2004 Agreement, however, obligated Craft to convey *100%* of his rights in all musical compositions and sound recordings that he owned for the exact same consideration outlined in the Deal Memos, leading Craft to accuse Plaintiff of a "surreptitious switching of material terms" constituting fraud in the execution.  Craft Br. at 9 (citing *Hetchkop*, 116 F.3d at 32 ("[T]he defense may apply to the substitution of a document of the same kind where the new document introduced important terms that were materially different from those to which the party had

agreed.").[36]  Neither Plaintiff in its briefing nor Fuchs during his deposition has provided a coherent or plausible explanation for the fact that the percentage of ownership doubled from 50% in the Deal Memos to 100% in the final October 2004 Agreement, without any corresponding change in consideration.  *See* Fuchs Tr. at 145–49; Defs.' Br. at 10.[37]  There is also no explanation for why the Deal Memos were limited to seven specific albums, whereas both the Draft Agreement and the final October 2004 Agreement obligated Craft to transfer rights in *all* musical works in which he had an interest.[38]

Plaintiff replies that the Deal Memos cannot form the basis of a fraud theory because there is no evidence that Craft was ever sent the Deal Memos, pointing to the fact that Craft explicitly testified that he had never seen them, and Fuchs (Plaintiff's principal) testified that he had no recollection of sending them to Craft.  *See* Pl.'s Rep. at 15.  This is at least a disputed factual issue, however.  For one thing, discovery produced an unsigned letter written by Fuchs and addressed to Craft, dated October 25, 2004, in which Fuchs writes that he "sent [Craft] a deal

---

[36] Craft also argues that a fraudulent switching of material terms took place because (i) the Draft Agreement obligated Craft to transfer the works listed on Schedule C only "to the extent" he had such interest, whereas (ii) the final October 2004 Agreement obligated Craft to transfer all works listed on Schedule C without the "to the extent" caveat, despite the undisputed fact that Plaintiff and Craft did not know the individual titles of the works listed in Schedule C at the time of execution.  *See* Craft Br. at 11.  This does not rise to the level of a fraudulent switch because, as Craft's brief points out, the final October 2004 Agreement (like the Draft Agreement) only obligated Craft to warrant that he owned the works listed in Schedules A and B, not Schedule C.  *Id.*  Thus, the fact that the final agreement omitted the "to the extent" clause was not actually a switch in material terms, because Craft never had to warrant ownership of the Schedule C works under either version of the agreement.  Furthermore, the argument is premised on a faulty reading of both the draft and the final agreement, both of which clearly obligated Craft to transfer rights in *all* of the works he owned, "including but not limited to" the works listed in the three attached schedules.  Again, then, the fact that the "to the extent" clause was omitted did not alter Craft's substantive obligations at all, because in both the draft and final agreements he was ultimately required to transfer rights in all of the works he actually owned, whether or not they were specifically listed on any of the schedules.

[37] Similarly, Craft purportedly conveyed his rights in the Speed trademark via the 2004 Amendment for no additional consideration, which Fuchs was also unable to explain.  *See* Fuchs Tr. at 154–55.

[38] During his testimony, Fuchs implausibly claimed that at least the final Deal Memo is best interpreted as applying to all musical works that Craft owned, not just the seven albums listed.  *See* Fuchs Tr. at 119–20.  No reasonable juror could so conclude given the language of the Deal Memos, which plainly limits the transaction to the seven specific albums listed within the memos.

memo via the mail last week," but that Craft should "disregard" that memo and look to a new version of the memo that was "more complete" and enclosed with the letter.  Salzler Decl., Ex. L.  Fuchs also testified that he held roughly seven separate meetings with Craft during which the two negotiated deal terms, which suggests that at least the substance of the Deal Memos were communicated to Craft at some point.  Fuchs Tr. at 48–52; *see also id.* at 68–69 (stating Fuchs's view of the importance of conveying terms of the deal to Craft); *id.* at 75:14–17 ("I have never created a deal point in the presentation of a contract that hadn't been discussed with the other party in advance.").  Moreover, Craft testified that the only agreement he actually recalled entering into with Plaintiff contained terms that resemble the terms in the Deal Memos, again suggesting that Craft at least contemplated the substance of the Deal Memos during negotiations.  *See* Craft Tr. at 163–69, 195–98 (discussing "[v]ery limited" deal with Plaintiff for "about six records" in which Plaintiff would have limited use of master recordings for four to five years in exchange for royalties); Craft Tr. II at 63–64 (testifying that his deal with Plaintiff was for "old stuff" that was not explicitly discussed at deposition).

Plaintiff also argues that the fraud-in-the-execution defense cannot prevail because there is no proof of Craft's "excusable ignorance of the contents of the writing signed," which is a required element of the defense.  *Hetchkop*, 116 F.3d at 32 (citations omitted); *see also* Pl.'s Rep. at 15–16.  "Proving excusable ignorance requires a showing that the party satisfied its basic responsibility of reading what it signed."  *McCaddin v. Se. Marine Inc.*, 567 F. Supp. 2d 373, 380 (E.D.N.Y. 2008) (citation and internal quotation marks omitted).  "Excusable ignorance may be proven by presenting evidence that someone secretly changed an important term of the contract before the ignorant party signed it, and that the ignorant party lacked a reasonable

40

opportunity to learn of the change before signing." *A. Terzi Prods., Inc.*, 1999 WL 33870, at *2 (citing *Hetchkop*, 116 F.3d at 31–32).

There remains a genuine issue of fact as to whether Craft's ignorance of the terms of the October 2004 Agreement was excusable and not negligent.  Plaintiff argues that there is no evidence that Craft read the Draft Agreement and, even if he did, it was dated October 5, 2004, meaning Craft had a reasonable opportunity in the three-week period between the draft and the final October 2004 Agreement, dated October 27, 2004, to review the final terms.  Pl.'s Rep. at 15–16 & n.17.  But the Court reiterates that Craft recalled signing a deal containing terms that resembled both the terms in the Deal Memos and the Draft Agreement, and notably, the final Deal Memo was dated and arguably mailed to Craft *only two days* before the final agreement was signed.  Salzler Decl., Ex. L; Craft Tr. at 163–69, 195–98; Craft Tr. II at 64.  In addition, Craft's testimony demonstrates his belief that he thought he was signing a much more limited deal—much closer to the one outlined in the Deal Memos—than the agreement that Plaintiff eventually provided to him for signing.  *See, e.g.*, Craft Tr. at 195–98 (stating that the October 2004 Agreement "doesn't even say the songs that I legally gave them to put out"); *id.* at 199–200 (stating that Fuchs "never sent you the deal that really I made with him").  This testimony and the Deal Memos themselves create a factual dispute as to whether Craft intended to agree to the much more limited terms that he had been negotiating with Fuchs up to two days before he actually signed the final document.  Having potentially seen a draft of the full agreement on or after October 5th, and repeatedly seen and/or discussed specific terms with Fuchs in the ensuing weeks, Craft may not have been negligent in failing to identify the small but significant changes made to the final October 2004 Agreement before he signed it.

The enforceability of the 2004 Agreements thus remains a disputed issue to be resolved at trial, because Defendants and Craft may be able to convince a reasonable juror that, despite Craft's signature on the final documents, the execution of those documents was fraudulent due to Plaintiff's misrepresentation of the essential terms.

### b. Undue Influence

To support both his affirmative claim for rescission and his affirmative defense seeking to vitiate the 2004 Agreements, Craft argues that he was essentially coerced into signing the agreements by virtue of Plaintiff's "undue influence."  Craft Br. at 11–14; Craft Answer ¶¶ 103–08 (alleging that Plaintiff "unduly influenced Craft into entering into the [October] 2004 Agreement by utilizing its prior relationship with Craft so that he did not seek counsel to help negotiate an agreement that he did not fully understand").  "Under New York law, a party claiming that it was unduly influenced to enter a contractual relationship must prove that it contracted under circumstances indicating that a relationship of control existed and that the stronger of the two parties had exerted influence over the other to destroy the weaker party's free will and substitute for it the will of the [other]."  *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 393 (S.D.N.Y. 2001) (citation and internal quotation marks omitted).  "The burden is heavy:  [A] party seeking to invalidate a contract must demonstrate that it was manipulated into signing a contract as a consequence of conduct worse than 'even pressure, no matter how bad' because 'undue influence is tantamount to a species of cheating.'"  *Id.* (quoting *Kazaras v. Mfrs. Tr. Co.*, 164 N.Y.S.2d 211, 221 (N.Y. App. Div. 1957)).  "Moreover, a court considering an undue influence defense must find that there was 'an advantage sought and obtained for the actor or another in whom he has an interest.'"  *Id.* (quoting *Kazaras*, 164 N.Y.S. at 220).

Craft supports his position by arguing that Fuchs, who admitted to having a long-term business relationship with Craft and meeting alone with him many times during the 1990s and 2000s, "knew or should have known" that Craft, an 84 year-old in 2004, "was susceptible to 'confusion, forgetfulness, and influence in his decision making,'" a characterization taken from an affidavit submitted in this litigation by Craft's daughter, Carrie Craft.  Craft Br. at 12 (quoting Affidavit of Carrie Craft (Doc. 143)).  Craft further notes that he was not supported by counsel during the negotiations leading up to the 2004 Agreements, and reiterates the alleged fraudulent term-switching among the Deal Memos, Draft Agreement, and final agreements that animate his fraud-in-the-execution defense discussed above.  *Id.* at 12–13.  Craft also maintains that undue influence can be inferred from the lopsided terms of the final deal—namely, the low amount of total consideration,[39] a "far from standard" clause in which Craft expressly "warrants that he understands all of the terms and conditions of this contract," and the inclusion of individual "famous" songs that "TufAmerica knew Craft could not possibly have owned and has now admitted that TufAmerica does not own."[40]  *Id.* (quoting October 2004 Agreement at § 11).

As the above makes clear, all of Craft's evidence of undue influence is circumstantial. "Although undue influence may be established through circumstantial evidence, such evidence must be of a substantial nature, and an inference of undue influence cannot be reasonably drawn from circumstances when they are not inconsistent with a contrary inference."  *In re Favaloro*, 942 N.Y.S.2d 579, 583 (N.Y. App. Div. 2012) (citations and internal quotation marks omitted). "Furthermore, [a] mere showing of opportunity and even of a motive to exercise undue influence

---

[39] "The principle that courts will not examine the sufficiency of consideration applies 'except as bearing upon undue influence.'"  *Shvili*, 152 F. Supp. 2d at 393 (quoting *Cowee v. Cornell*, 75 N.Y. 91 (1878)).

[40] Craft identifies "Last Train to Clarksville," "Going Out of My Head," "Do You Know the Way to San Jose," "Midnight Hour," and "Sweet Soul Music."

does not justify a submission of that issue to the jury, unless there is in addition[al] evidence that such influence was actually utilized." *Id*. (citations and internal quotation marks omitted).

Here, Craft fails to present evidence that undue influence was actually utilized. While circumstantial evidence may demonstrate that Fuchs had the motive and opportunity to coerce Craft, and may even show that Craft was tricked into signing an agreement that he did not assent to, it does not show that Fuchs went beyond mere pressure and exercised actual dominion over Craft, forcing him to sign a document against his free will. *See Hearst v. Hearst*, 857 N.Y.S.2d 596, 600 (N.Y. App. Div. 2008) (requiring "evidence that a defendant's influence amounted to a moral coercion, which restrained independent action and destroyed free agency," or evidence that "importunity which could not be resisted" forced the counter-party to "do that which was against his [or her] free will and desire, but which he [or she] was unable to refuse or too weak to resist") (citations and internal quotation marks omitted). Both Craft's counterclaim and affirmative defense based on undue influence must therefore fall to summary judgment.

### c.   Unclean Hands

Finally, Craft argues that Plaintiff's three claims for equitable relief asserted against him (two for declaratory judgment and one for an injunction) are barred by the doctrine of unclean hands. Craft Br. at 16–17. "'The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.'" *Genger v. Genger*, 76 F. Supp. 3d 488, 502 (S.D.N.Y. 2015) (quoting *Kopsidas v. Krokos*, 742 N.Y.S.2d 342, 344 (N.Y. App. Div. 2002)).

In support of his claim, Craft relies primarily on the same evidence and arguments used to support his fraud-in-the-execution and undue-influence defenses, and also argues that an unclean-hands defense is supported by the fact that Plaintiff's counsel represented Craft during his first deposition in this case, only to later withdraw from representation and add Craft as a defendant after he repudiated the 2004 Agreements during the deposition.  Craft Br. at 16–17. Since the Court has already determined that there are genuine issues of material fact with respect to whether Plaintiff fraudulently switched the terms of the final 2004 Agreements and secured Craft's unknowing signature—conduct that, if proven, is both directly related to this litigation and relied upon by Craft to his detriment—the Court declines Plaintiff's request to strike this affirmative defense, and holds that there remain triable issues as to whether Plaintiff's equitable claims against Craft are barred by the doctrine of unclean hands.

### d.  Craft's Contract Counterclaims

Plaintiff has moved for summary judgment on Craft's three counterclaims pertaining to the 2004 Agreements and another, unproduced licensing agreement purportedly executed between Plaintiff and Craft.  Pl.'s Br. at 43.

The Court has already determined that no genuine issues of fact exist as to Craft's contention that he was unduly influenced to enter into the October 2004 Agreement.  His first counterclaim seeking rescission based on undue influence must therefore fall to summary judgment for that reason.

Craft's second counterclaim is for breach of contract, and it is premised on the theory that, if the Court were to find that the October 2004 Agreement were effective, Plaintiff has nevertheless breached its obligation under that agreement to (i) "compute and pay certain royalties to Craft," and (ii) "to exploit the compositions and sound recordings subject to the

[October] 2004 Agreement" beyond the mere release of "three vinyl albums in over six years," the only such exploitation by Plaintiff that has taken place to date.  Craft Answer ¶¶ 109–13.  As Plaintiff rightly argues, there is no term in the October 2004 Agreement that obligates Plaintiff to exploit the transferred works with any sort of frequency, or indeed to exploit the works at all. *See* Pl.'s Br. at 46.  There is, however, an undisputed obligation to pay royalties in the event of such exploitation, and there remains a disputed factual issue as to whether Craft was paid royalties owed to him under the agreement's terms.  *Compare* Zarin Decl., Ex. V (royalty statement crediting $2,765.24 in royalties against Craft's $5,000 advance), *with* Craft Tr. 168, 185 (Craft testimony stating that he was never paid royalties owed under limited licensing deal), *and id.* at 195–98 (Craft testimony stating that he does not recognize royalty statement).  Summary judgment is thus denied on Craft's second counterclaim, but only to the extent that it is premised on failure to pay royalties.

Craft says that his third counterclaim refers to Plaintiff's breach of its obligations under a "short term licensing agreement" to which Craft referred during deposition, but has never been produced.  Craft Br. at 7.  Craft does not build on his sparse testimony with any additional evidence or argument.  Without the benefit of the agreement itself, and with only the aid of Craft's vague allusions to an agreement that say nothing about specific terms of the parties' respective obligations, no reasonable juror could find that Plaintiff is liable for breach of contract.  The Court will therefore grant summary judgment on Craft's third counterclaim.

### 5.  There Are No Triable Issues Distinct to Post-2004 Agreements

While Plaintiff's theory of title to the musical works culminates in the 2004 Agreements, Defendants' theory relies on a trio of post-2004 Agreements that Plaintiff attempts to call into question.  None of Plaintiff's arguments, however, raises triable issues that are *distinct* from the

factual disputes over the contested pre-2004 ownership of the works in question.  In other words, these three agreements are clear and unambiguous on their own terms, and the only issue that remains is whether the purported transferor in each respective agreement validly owned the works being transferred prior to that agreement.

**Sonido-Emusica Agreement:**  First, Plaintiff argues that the Sonido-Emusica Agreement from 2005 did "not purport to transfer *any* of the sound recordings or musical compositions at issue" because those works were not specifically included in the section of the agreement titled "Acquired Assets."  Pl.'s Br. at 37; *see also* Pl.'s 56.1 ¶ 68.  Defendants rightfully point out, however, that (i) the agreement contains a catch-all provision plainly stating that the agreement effects a transfer of all of Sonido's assets, even if the "Acquired Assets" section does not represent a comprehensive listing of said assets, and (ii) the agreement specifically lists Fania as one of the record labels owned by Sonido.  *See* Defs.' 56.1 Counter ¶ 68 (citing Sonido-Emusica Agreement, §§ 1.1, 1.2 & p.1).  Plaintiff fails to rebut these points, and thus fails to create a triable issue pertaining to the Sonido-Emusica Agreement.  *See* Pl.'s Rep. at 11–12 (responding only by arguing that Fania did not acquire the works at issue in 1975).  Thus, setting aside the many factual disputes regarding chain-of-title *prior* to 2004, there is no distinct triable issue with respect to the meaning and effect of the Sonido-Emusica Agreement.

**Marin-Emusica Agreement:**  The only attack Plaintiff makes on the validity of the Marin-Emusica Agreement from 2007 is to question whether Marin actually owned the Happy Man Composition in the first instance.  Pl.'s Rep. at 11.  This is of course a disputed issue of fact, but it does not call into question the purported meaning or effect of the agreement itself.

**Emusica-Codigo Agreement:**  Plaintiff attempts a familiar argument with respect to the Emusica-Codigo Agreement from 2009, arguing that the annexed schedule of musical

compositions does not specifically include the Happy Man, Happy Soul, Happy Soul with a

Hook, or Hippy Skippy Compositions, and thus the agreement did not effectuate a transfer of

said compositions from Emusica to Codigo.  Pl.'s Br. at 37.  Once again, however, the agreement

contains very clear catch-all language manifesting an intent to transfer all of Emusica's assets,

including the administrative rights obtained via the Marin-Emusica Agreement, whether or not

such assets are specifically listed on attached schedules.  *See* Emusica-Codigo Agreement § I.1.1

(defining "Acquired Assets" to include "all of Sellers' assets, properties, goodwill and business,"

"including" the musical compositions listed on Schedule 1.1(b), "all contracts, agreements,

licenses or arrangements by which Sellers have obtained or would in the future obtain rights

to…Compositions or the services or cooperation of songwriters or co-publishers," and "all rights

of administration of Sellers in respect of any Compositions").  Again setting aside factual

disputes about the pre-2004 chain-of-title, there are no distinct triable issue with respect to the

meaning and effect of the Emusica-Codigo Agreement.

### C.  Trademark Claims

#### 1.  Triable Issues Exist as to Speed Trademark Claims

Plaintiff's second cause of action and Defendant Codigo's third counterclaim seek relief

based on infringement of the Speed trademark.  Plaintiff's claim is brought under New York

common law, while Defendant Codigo's counterclaim is brought under the federal Lanham Act.

Furthermore, Plaintiff's seventh cause of action seeks a judgment declaring Plaintiff to be the

rightful owner of the Speed trademark.  Plaintiff has moved for summary judgment on Defendant

Codigo's Lanham Act counterclaim, and Defendant Codigo has moved for summary judgment

on both Plaintiff's common law infringement claim and its claim for declaratory judgment.

"The elements of a federal trademark-infringement claim and a New York unfair competition claim are almost indistinguishable, except that New York requires an additional element of bad faith" and proof of actual confusion if money damages are sought. *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10 Civ. 1611 (PKC), 2012 WL 1022247, at *20 (S.D.N.Y. Mar. 22, 2012) (citation and internal quotation marks omitted); *see also Advance Magazine Publishers, Inc. v. Norris*, 627 F. Supp. 2d 103, 112 (S.D.N.Y. 2008) ("The elements of Defendants' common law claims for trademark infringement and unfair competition are similar to their federal claims, except that New York unfair competition law also requires a showing of actual confusion and bad faith before monetary relief maybe awarded.") (citing *Real News Project, Inc. v. Indep. World Television, Inc.*, No. 06 Civ. 4322 (GEL), 2008 WL 2229830, at *5–6 (S.D.N.Y. May 27, 2008); *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 702 (S.D.N.Y. 1999)) (internal quotation marks omitted).  Thus, Plaintiff's claim for declaratory judgment and Defendant Codigo's counterclaim under the Lanham Act require proof that the party asserting the claim (1) owned a valid and protectable trademark in the "Speed" name, and (2), "if so, whether it was probable that consumers would be confused" by the opposing party's use of that trademark.  *See Norris*, 627 F. Supp. 2d at 112 (citing *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004)).  In addition, Plaintiff's common law claim for trademark infringement, to the extent it seeks money damages, requires proof that (i) consumers were *actually confused* by Defendant Codigo's use of the Speed trademark (beyond a mere *likelihood* of confusion), or (ii) that Defendant Codigo showed bad faith in its unauthorized use of the mark.  "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies'

products." *KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 368 (S.D.N.Y. 2014) (quoting *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005)).

Both parties exert little-to-no effort marshalling evidence in support of their trademark-related claims.  Because both sides argue that the Speed trademark was transferred via the same, largely contested chain-of-title as the Sound Recordings, however, disputed issues of fact remain as to the first element of all the trademark claims here, *i.e.*, whether the complainant actually owns a valid and protectable trademark in the Speed name.  Thus, none of the following are amenable to resolution on summary judgment:  (i) Plaintiff's common law infringement claim, to the extent it seeks an injunction, Compl. ¶ 50 (seeking both monetary and injunctive relief), (ii) Plaintiff's request for a declaratory judgment that it owns the Speed trademark, and (iii) Defendant Codigo's federal trademark infringement claim.

Assuming *arguendo*, however, that Plaintiff was the rightful owner of the Speed trademark, no reasonable juror could award Plaintiff money damages for its common law infringement claim, because that claim requires proof of bad faith and/or actual confusion that is non-existent on this record.  The Court thus grants Defendant Codigo's motion for summary judgment on Plaintiff's second cause of action, but only to the extent that claim seeks money damages.

### 2.  No Triable Issues Exist as to Defendant Codigo's Lanham Act Claims Regarding the Musical Compositions and Sound Recordings

Defendant Codigo's third counterclaim under the Lanham Act purports to apply not only to the Speed trademark, but also to the musical compositions and sound recordings at issue here.  Codigo Answer at 20, ¶ 62.  The claim "alleges a violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits false designations of origin of goods in interstate commerce.  The main goal of § 43(a) of the Lanham Act is to prevent consumer confusion regarding the

source of the goods or services produced." *Sun Trading Distrib. Co. v. Evidence Music, Inc.*, 980 F. Supp. 722, 726–27 (S.D.N.Y. 1997) (citing *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 215 (2d Cir. 1985)).

Although there are various types of Lanham Act claims, the only conceivable claim Defendant Codigo could be forwarding here is a claim for "reverse palming off,"[41] which "occurs when the wrongdoer eliminates the designation of source from the plaintiff's product and sells that product under its own name." *Id.* at 727 (citing *Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995). "Reverse passing off harms the originator of the misidentified product because he is involuntarily deprived of the advertising value of [his] name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." *Id.* (citation and internal quotation marks omitted). "To establish a Lanham Act violation based on 'reverse passing off,' the plaintiff must prove that (1) the product at issue originated with plaintiff, (2) the origin of the product was falsely designated by the defendant, (3) the false designation of origin was likely to cause consumer confusion, and (4) the plaintiff was harmed by the defendant's false designation of origin." *Id.* (citing *Lipton*, 71 F.3d at 473).

Plaintiff argues that the Lanham Act does not extend to musical compositions. Pl.'s Br. at 41. That is not quite right. It is true that "a musical composition cannot be protected *as its own trademark* under the Lanham Act." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 64 (2d Cir. 2000) (emphasis added); *see also id.* ("The different, source-identifying function of trademarks requires that a trademark in a musical composition not be coextensive with the music itself."). But like many other types of creative works protectable by the copyright laws, such as graphic designs, musical compositions may become sufficiently

---

[41] Plaintiff also assumes that Defendant Codigo asserts a Lanham Act claim for "reverse palming off," Pl.'s Br. at 41–42, which Codigo never refuted in its subsequent briefing.

associated with a particular product or producer so as to garner trademark protection.  *See Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56, 61 (2d Cir. 2001) ("We can see no reason why a musical composition should be ineligible to serve as a symbol or device to identify a person's goods or services.").  That said, Defendant Codigo has not pointed to a single piece of evidence demonstrating (i) that the two Compositions here originated with Codigo or served to identify a particular good or service, (ii) that Plaintiff falsely designated the origin of the two Compositions, or (iii) that Plaintiff's use of the works has caused a likelihood of consumer confusion.  *See* 15 U.S.C. § 1127 (defining trademark as a symbol or device used to "identify and distinguish…goods"); *Sun Trading*, 980 F. Supp. at 729 (granting summary judgment where plaintiff neither offered "evidence of actual consumer confusion that has or will result in harm to the plaintiff," nor "raised an issue of fact as to the likelihood of consumer confusion, an essential element of the claim").

The same paucity of evidence precludes Defendant Codigo's Lanham Act claim as it relates to sound recordings, and for the same reasons.  No reasonable juror could find that the Sound Recordings at issue here are associated with Defendant Codigo as a producer of goods, *i.e.*, that a valid trademark existed, or that Plaintiff misrepresented the source of the Sound Recordings in a manner likely to confuse consumers as to the source of those recordings.  *See, e.g.*, *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 327 (2d Cir. 1995) (dismissing Lanham Act claim based solely on fact that defendant "made unauthorized use" of sound recording without payment of royalty or proper credit, because there was no allegation that defendant "intentionally used" sound recording "to deceive the public, nor is there any factual allegation that the public was in any way confused as to the source of the sound recording as a result of [defendant's] failure to attribute that recording to [plaintiff]"); *Freeplay Music, Inc. v. Cox*

*Radio, Inc.*, 409 F. Supp. 2d 259, 263–64 (S.D.N.Y. 2005) (dismissing Lanham Act claim "based on the very acts of producing and broadcasting allegedly infringing works that form the factual underpinning of its copyright claims").

Both of Defendant Codigo's Lanham Act claims also fail for another reason.  Because Defendant Codigo seeks money damages, Codigo Answer at 20, ¶¶ 64–65, "it is required either to proffer evidence of actual consumer confusion, or to proffer evidence of deceptive intent which results in a presumption of consumer confusion."  *E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co.*, No. 00 Civ. 8670 (LTS), 2005 WL 535065, at *12 (S.D.N.Y. Mar. 8, 2005); *see also Guthrie Healthcare Sys. v. ContextMedia, Inc.*, No. 12 Civ. 7992 (KBF), 2014 WL 185222, at *5 (S.D.N.Y. Jan. 16, 2014).  Defendant Codigo has failed to set forth any evidence on this score, and thus has failed to raise a genuine issue of material fact to survive summary judgment on its Lanham Act claims for money damages.  *See E-Z Bowz*, 2005 WL 535065, at *12 (granting summary judgment where complainant failed to proffer "sufficient evidence for a rational factfinder to conclude that there was actual consumer confusion or that [defendant] intended to deceive the public and engaged in deliberate conduct of an egregious nature"); *see also Mapinfo Corp. v. Spatial Re-Eng'g Consultants*, No. 02 Civ. 1008 (DRH), 2006 WL 2811816, at *11–12 (N.D.N.Y. Sept. 28, 2006) (finding "no genuine issue of material fact as to actual customer confusion" when complainant failed to identify an actual consumer or reseller who was confused by the alleged reverse palming off); *Sun Trading*, 980 F. Supp. at 729.

### D.  Plaintiff's Request to Strike Affirmative Defenses

Plaintiff has moved to strike Defendants' affirmative defenses for which they have failed to adduce any evidence.  Specifically, Plaintiff moves to strike (1) Defendants' joint affirmative defenses of equitable estoppel, unclean hands, acquiescence, laches, and statute of limitations,

(2) Defendant Codigo's defenses of lack of trademark registration, waiver, statute of frauds, and § 411 of the Copyright Act, and (3) Defendant COMG's defenses of collateral estoppel and res judicata.  Pl.'s Br. at 5–6.

Defendants do not attempt to point out evidence from the record that supports of any of these defenses.  Instead, they respond only that Plaintiff, as the movant, has not satisfied its summary judgment burden by simply arguing that no evidence exists to support Defendants' affirmative defenses.  Defs.' Opp'n at 23.  But Defendants get the law backwards.  "Where a plaintiff uses a summary judgment motion…to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case.'"  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30 (2d Cir. 1993)).  And since Defendants bear the burden of proving their affirmative defenses at trial, Plaintiff is not required to support its summary judgment motion with affidavits or other materials that tend to disprove the defenses.  *See, e.g.*, *id.* (citation omitted); *Cont'l Airlines, Inc. v. Lelakis*, 943 F. Supp. 300, 304–05 (S.D.N.Y. 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997).  Rather, where the non-movant "fails to introduce any evidence sufficient to support an essential element of a defense, the court may properly grant summary judgment dismissing such a defense as a matter of law." *UMG Recording, Inc. v. Escape Media Grp., Inc.*, No. 11 Civ. 8407 (TPG), 2014 WL 5089743, at *18 (S.D.N.Y. Sept. 29, 2014) (citing *In re Livent, Inc. Noteholders Secs. Litig.*, 355 F. Supp. 2d 722, 728 (S.D.N.Y. 2005)).  Plaintiff's motion to strike ten of the eleven affirmative defenses listed above is therefore granted because there is no evidence to support these defenses.  The one exception, which the Court will allow Defendants to try to establish at trial, is lack of trademark

registration—that defense speaks for itself and is implicitly supported by the Defendants' evidence regarding their purported claim of title to the Speed trademark.

On the other hand, Plaintiff also seeks to dismiss Defendants' affirmative defenses of lack of ownership, lack of standing, and fraud because they purportedly "lack merit." Pl.'s Br. at 6. As the above discussion of the bevy of remaining triable issues should make clear, however, Defendants have adduced evidence from which a reasonable juror could rule in their favor on these defenses. Plaintiff's motion with respect to these three defenses is therefore denied.

### E. Defendants' Request for Attorney's Fees

Defendants request attorneys' fees under 17 U.S.C. § 505. Defs.' Br. at 17. Because Defendants' have not prevailed on the bulk of their summary judgment motion, nor on their affirmative counterclaims, their request is denied at this time.

### III.   CONCLUSION

Plaintiff's and Defendants' cross-motions for summary judgment are GRANTED in part and DENIED in part, as summarized in the charts below.

| Defendants Codigo and COMG's Motion for Summary Judgment | |
|---|---|
| ***To Dismiss Plaintiff's Claims*** | ***The Court's Ruling*** |
| 1)  Copyright infringement against Codigo | DENIED |
| 2)  Trademark infringement against Codigo | GRANTED with respect to money damages; DENIED with respect to injunctive relief |
| 3)  Unfair competition against Codigo regarding sound recordings | DENIED |
| 4)  Unjust enrichment against Codigo and COMG | DENIED |
| 5)  Misappropriation against Codigo and COMG regarding sound recordings | DENIED |
| 6)  Declaratory judgment against Codigo regarding musical compositions and sound recordings | DENIED |
| 7)  Declaratory judgment against Codigo regarding Speed trademark | DENIED |
| 8)  Declaratory judgment against COMG regarding Hippy Skippy Composition | DENIED |

| Plaintiff's Motion for Summary Judgment | |
|---|---|
| **In Favor of Plaintiff's Claims** | **The Court's Ruling** |
| 1) Declaratory judgment against Codigo regarding musical compositions and sound recordings | DENIED |
| 2) Declaratory judgment against COMG regarding Hippy Skippy Composition | DENIED |
| 3) Declaratory judgment against Craft regarding the 2004 Agreement | DENIED |
| 4) Declaratory judgment against Craft regarding the 2004 Amendment | DENIED |
| 5) Injunctive relief against Craft regarding the 2004 Agreements | DENIED |
| **To Dismiss Defendant Codigo's Counterclaims** | **The Court's Ruling** |
| 1) Declaratory and injunctive relief regarding DNJ Settlement and the musical compositions, sound recordings, trademark at issue | DENIED |
| 2) Copyright infringement | DENIED |
| 3) Lanham Act unfair competition | GRANTED as to musical compositions; GRANTED as to sound recordings; DENIED as to Speed trademark |
| 4) Unjust enrichment | DENIED |
| 5) Misappropriation regarding musical compositions and sound recordings | GRANTED as to musical compositions; DENIED as to sound recordings |
| **To Dismiss Defendant COMG's Counterclaims** | **The Court's Ruling** |
| 1) Declaratory and injunctive relief regarding DNJ Settlement and the musical compositions, sound recordings, trademark at issue | DENIED |
| 2) Unfair competition regarding musical compositions and sound recordings | GRANTED as to musical compositions; DENIED as to sound recordings |
| 3) Unjust enrichment | DENIED |
| 4) Misappropriation regarding musical compositions and sound recordings | GRANTED as to musical compositions; DENIED as to sound recordings |
| **To Dismiss Defendant Craft's Counterclaims** | **The Court's Ruling** |
| 1) Undue influence and rescission of 2004 Agreements | GRANTED |
| 2) Breach of contract regarding 2004 Agreements | GRANTED to extent claim is based on obligation to "exploit" musical works; DENIED to extent claim is based on obligation to pay royalties |
| 3) Breach of contract regarding licensing agreement pre-dating 2004 Agreements | GRANTED |

| *To Strike Affirmative Defenses* | *The Court's Ruling* |
|---|---|
| 1)  Codigo and COMG's Joint Defenses | GRANTED |
| 2)  Codigo's Defenses | DENIED as to lack of ownership, lack of standing, fraud, and lack of trademark registration<br>GRANTED as to all other affirmative defenses |
| 3)  COMG's Defenses | GRANTED |

The parties are directed to appear for a status conference on **Thursday, March 17, 2016, at 10:30 AM**. The Clerk of the Court is respectfully directed to terminate the motions (Docs. 121, 131).

It is SO ORDERED.

Dated:   February 16, 2016
         New York, New York

Edgardo Ramos, U.S.D.J.

57